Davis, Judge,
delivered the opinion of the court:
This breach-of-contract case arises out of the plaintiff's agreement with the Public Housing Administration to construct, at Presque Isle, Maine, a defense housing project consisting of 275 dwelling and 7 laundry units. The Government required plaintiff to bear the expense of certain work which is said to be outside the contract obligations. We find that, for the most part, plaintiff is not entitled to recover.
The first claim is for weather-stripping the windows of the project units. The contract provided for storm-windows (in addition to the regular windows) and plaintiff installed those. But plaintiff’s officers did not read the contract as calling for weather-stripping on the normal windows which were to be protected by storm-windows, and no such weatherstripping was furnished. After completion of the project, the defendant insisted that stripping was part of the contract and should have been supplied; on plaintiff’s refusal to do this work, the Government entered into a substitute contract with another contractor, expending $16,144.81 which was withheld from plaintiff. Belief was denied by the contracting officer and the head of the agency, both of whom decided that the contract documents required that metal weatherstrips be furnished and installed on all regular windows. Since the dispute is a legal one, turning on the meaning and application of the contract terms, neither plaintiff nor this court is bound by the adverse administrative rulings within the Public Housing Administration. See 41 U.S.C. § 322; Allied Contractors, Inc. v. United States, 129 Ct. Cl. 400, 407, 124 F. Supp. 366, 370 (1954); Ready-Mix Concrete Co., Ltd. v. United States, 141 Ct. Cl. 168, 176, 158 F. Supp. 571, 577 (1958); Kayfield Constr. Corp. v. United States, 278 F.2d 217, 218 (C.A. 2, 1960) (cf. Salem Products Corp. v. United States, 298 F. 2d 808, 810 (C.A. 2, 1962)); Kenny Constr. Co. v. District of Columbia, 262 F. 2d 926, 928-929 (C.A.D.C., 1959).
*4 The specifications, which accompanied the invitation for bids and constituted a part of the contract, were prepared by a firm of Boston architects hired by Public Housing Administration. In pertinent part, they provided that:
Weatherstrips for entrance doors shall be brass, bronze, zinc or stainless steel strips not less than .017 inches thick, one or two member, manufacturer’s standard type, providing a weather tight seal on all Jy edges of doors and easement a/nd double hwng sash. They shall adjust themselves to the swelling and shrinking of the sash and frames without impairing their efficiency or the easy operation of the sash and doors. * * * Weatherstrip shall be provided for all doors, opening out, in service building, (emphasis added)
(In the building industry, “sash” is a generic term for a window; “double hung sash” is the ordinary type of window which moves up and down). One of the drawings supplied with the invitation for bids contained the notation “metal weatherstrips — see specifications,” and a large red arrow pointed from this note to a double-hung regular window; in addition, there was a notation “metal sill covering” (a part of the weather-stripping of a window), again with an arrow pointing to the design of a window.
Anyone reading these contract papers as carefully as a prospective builder could not help but notice that, with respect to the weather-stripping of windows, something was gravely askew. The written specification starts by referring only to strips for entrance doors, not windows — but then that very opening sentence ends by requiring a weather-tight seal “on all 4 edges of doors and casement and double hung sash [i.e., windows].” The nest sentence, too, refers to an adjustment of the weatherstrips to windows, as well as to doors; and the drawings twice link the ordinary windows of the units to weather-stripping. We think it undeniable that there are surfacial inconsistencies, at the least, within the specification itself and between the specification and the drawing — part of the specification appearing to provide weather-stripping only for the entrance doors, while another part as well as the drawings seem to cover windows as well — which were and must have been obvious to plaintiff from the time it began to prepare its bid.
*5 Plaintiff did not, however, consult the defendant’s representatives in settling this problem, but decided for itself that weather-strips were required solely for the doors and not for windows. Presumably it reached this conclusion on the basis of (i) the wording of the first part of the first sentence of the specification dealing with weather-stripping, plus (ii) plaintiff’s understanding that the trade practice was that, even in Maine, weather-stripping is not installed on a regular window which is to be protected by a storm sash (as were the windows in this project). Accordingly, plaintiff calculated its bid and ordered its windows on the assumption that there would be no weather-stripping. It still asserts that this is the correct interpretation of the contract, emphasizing that, despite continuous supervision and regular inspections, defendant’s officials never mentioned the absence of strips on the windows until after completion of the project when tenants began to complain of the drafts.[1] The Government urges that the omission of a requirement for window-stripping at the beginning of the pertinent specifications was wholly inadvertent,[2] and that the remainder of the specification together with the drawings demonstrates that windows were included.
*6 As a matter of pure contract-construction, there is something to be said for both sides to this dispute, but in any event the important handicap is the express warning given to plaintiff, before it bid, that plain ambiguities of this type, in the specifications and drawings, were to be taken up with the Public Housing Administration. Article 2 of the contract (which was, of course, known to plaintiff before it made its bid) declared that “In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense.” The invitation to bid stated that requests for interpretation of the specifications and drawings could be made in writing to the Public Housing Administration, and that every interpretation made to a bidder would be issued as an addendum to the specifications and become part of the contract. We do not reach or decide the question of whether the provisions of Article 2, quoted above, would have any effect on the contractor’s rights if the ambiguity creating the issue of contract-interpretation first appeared, or the problem arose, after the contract was signed. In this case it is plain that, as we have found, the discrepancy was in actual fact, and in reason must have been, fully known to plaintiff before it computed its bid.[3] It had ample cause and opportunity to seek an interpretation from the Government before consummating the agreement, but it did not do so, electing to rest on its own private reading. A prime purpose of these contractual provisions relating to ambiguities and discrepancies is to enable potential contractors (as well as the Government) to clarify the contract’s meaning before the die is cast. The bidder who is on notice of an incipient problem, but *7 neglects to solve it as be is directed to do by this form of contractual preventive-hygiene, cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter (e.g., Peter Kiewit Sons’ Co. v. United States, 109 Ct. Cl. 390, 418 (1947)). Even more, the bidder in such a case is under an affirmative obligation. He “should call attention to an obvious omission in a specification, and make certain that the omission was deliberate, if he intends to take advantage of it.” Ring Construction Corp. v. United States, 142 Ct. Cl. 731, 734, 162 F. Supp. 190, 192 (1958). See also, to the same effect, Jefferson Constr. Co. v. United States, 151 Ct. Cl. 75, 89-91 (1960). If the bidder fails to resort to the remedy proffered by the Government, a patent and glaring discrepancy (like that which existed here) should be taken against him in interpreting the contract. We do not mean to rule that, under such contract provisions, the contractor must at his peril remove any possible ambiguity prior to bidding[4]; what we do hold is that, when he is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government’s representatives if he intends to bridge the crevasse in his own favor. Having failed to take that route, plaintiff is now barred from recovering on this demand.
The second claim relates to some roof panel and girder work which plaintiff deems a compensable change under the contract. After completion of the project, the Public Housing Administration told plaintiff that, among other things, it had failed to comply with the contract requirements because the roof rafters in many of the bedrooms had separated from the supporting girders. Specific directions were given for remedying the defect. One of the items was an additional roof tie which defendant agreed was an extra; to cover this addition, defendant issued in April 1953 a change order No. 44 for $1,487.75, which the contractor promptly accepted. Reserving its right to claim compensation for all of this roof panel and girder work, plaintiff performed the job and then sought, under the “changes” *8 provisions of the contract, a further payment of $4,999.09 (covering $1,487.75 for change order No. 44 plus $3,511.34 for the other work). In April 1954, the Acting Director of the New York Field Office of the Public Housing Administration, as successor contracting officer to the Boston Field Office, denied the claim for the additional $3,511.34 and rescinded change order No. 44. In February 1956, the Director of the New York Field Office reaffirmed this decision. Plaintiff appealed from neither determination.
The Trial 'Commissioner has found, and we agree, that these administrative findings cannot be disregarded as failing to meet the standards of the Wunderlich Act, 41 U.S.C. § 321-322. Although the contract required three 12d nails at many crucial points, plaintiff used only two, thus significantly reducing the tendency of the rafters and the girders to hold together. Plaintiff’s excuse was that use of three nails was not feasible at all the designated points, but the administrators properly found that plaintiff failed to drive three nails at the many spots where it was quite possible to do so. Moreover, plaintiff’s failure to 'appeal the contracting officer’s factual decision to the head of the agency precludes it from maintaining the claim in court. United States v. Joseph A. Holpuch Co., 328 U.S. 234 (1946). It is said that the letters from the New York Field Office were not entitled to be treated as appealable decisions of the contracting officer under the Disputes article because the contractor was not officially told that the New York Office had become the successor contracting office and, also, because the letters did not inform plaintiff in terms that they were official decisions determining the dispute. These objections are without substance; the record shows that plaintiff knew full well the status of the New York Office after the Boston Office closed, and plaintiff could not have read the New York letters without realizing that they were formal determinations of the controversy.
From this conclusion that plaintiff cannot recover on its second claim we except the $1,487.75 granted it by change order No. 44 (in April 1953) by the Boston Field Office. This was a final action by the contracting officer, not subject *9 to rescission after the work was done in reliance on the Government’s promise to pay for it. In accordance with the “changes” provisions, the contract was modified to increase plaintiff’s compensation.[5] The New York Field Office had no authority, in April 1954, unilaterally to rescind this change order and contract modification. Plaintiff was not bound by the unauthorized rescission and was not required to appeal to the agency head in order to preserve its right to the $1,487.75 upon which agreement had already been reached.
Plaintiff can recover only the $1,487.75 to which it is entitled under change order No. 44. It cannot recover on any of the other aspects of the claims, and as to them the petition will be dismissed.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of Massachusetts, with its principal place of business in Boston. Since its incorporation in 1946, plaintiff has constructed a number of large projects and has operated in approximately 20 states throughout the United States and in Puerto Rico. Norman Leventhal, president of plaintiff, is a graduate engineer and has been engaged in the construction business since 1945. He oversees all the work that plaintiff performs. Edward Leventhal, brother of Norman Leventhal, was at all material times general superintendent of plaintiff. He is a draftsman and a graduate in civil engineering and has been in charge of construction of a number of sizable projects. Robert Leventhal, brother of Norman and Edward Leventhal, was at all material times treasurer of plaintiff corporation.
2. This case involves a contract entered into on April 9, *10 1952, by plaintiff and defendant, acting through, the Public Housing Administration (PHA) for the construction of a defense housing project consisting of 275 dwelling units and 7 laundry units at Presque Isle, Maine. The contract price was $1,447,000. Presque Isle is approximately 400 miles due north of Boston, Massachusetts. The buildings erected at Presque Isle by plaintiff were single-room, 1-story, demountable-type structures standing on creosote posts and were a type of structure which could be dismantled and removed to a different location. The Presque Isle project was part of a nationwide housing program then being undertaken by PHA, and was one of three temporary housing projects then being built by PHA in New England.
WINDOW WEATHER-STRIPPING
3. Prior to issuing the invitation for bids for the construction of the defense housing project at Presque Isle, the defendant engaged a firm of Boston architects, Frost and Kandzie, to prepare specifications and drawings to accompany the invitation for bids. The Boston Field Office of PHA furnished the firm of architects with a set of stock drawings and a bulletin entitled “Specifications for Trailer Projects and for Temporary Projects * * * Defense Housing Bulletin,” both of which had been prepared by the Public Housing Administration in Washington, D.C.
4. (a) The Foreword of the bulletin furnished the firm of architects by the Boston Field Office of PHA reads in pertinent parts as follows:
These specifications have been prepared for use as a guide in writing specifications for Defense Housing, * * *.
These specifications, if properly used, are time-saving and should produce uniform and satisfactory results but, like all such material, must be used with extreme care so as to be adapted to each specific case. Many items will not be pertinent to every project and must, therefore, be deleted; some new items to fit special conditions may be required; and occasionally it will be found that retained items need to be modified, though it is urged that changes be made only under absolute necessity. Specification writers should read carefully the “notes to the archi *11 tect” preceding each division of the Specification and be governed accordingly. They should also exercise great care to see that the specifications are fully coordinated with the drawings.
(b) The notes to the architect contained in the bulletin preceding Division DHS 3, Carpentry and Millwork, reads in part as follows:
THIS SHEET IS POR THE INFORMATION OP THE ARCTITECT ONLY. DO NOT INCLUDE IN PROJECT SPECIFICATIONS.
‡ ‡ $
THE GENERAL SCOPE OP WORK SHOULD SHOW REQUIREMENTS FOR STORM WINDOWS AND COMBINATION DOORS AND WEATHERSTRIPS. STORM WINDOWS AND COMBINATION DOORS SHOULD BE INCLUDED FOR DESIGN TEMPERATURES LOWER THAN — 10°F.[6] WEATHERSTRIPS SHOULD BE FOR DESIGN TEMPERATURES BETWEEN +10° F. AND —10° F. DO NOT USE WEATHERSTRIPS WITH STORM SASH OR COMBINATION DOORS.
(c) Division DHS 3, Carpentry and Millwork, of the bulletin, reads in part as follows:
1. Scope.
Include in this division carpentry and millwork, flooring, siding, wallboard, rough hardware and all other work and material, except as specified in other divisions of this specification, of every nature required to complete the work under this contract. See the drawing and General Scope of Work for extent and location of work.
a. Storm sash, combination doors and weatherstrips for window sash and for sides and head of exterior doors shall be furnished only when specifically required in the General Scope of Work.
H* * $ $ $
8. Erection
* * # * *
s. Weatherstrips for casement and double hung windows and for entrance doors shall be brass, bronze, zinc or stainless steel strips not less than .017 inches thick, one or two member, manufacturer’s stancLard type, providing a weather tight seal on all 4 edges of doors and *12 casement and double bung sash. They shall adjust themselves to the swelling and shrinking of the sash and frames without impairing their efficiency or the easy operation of the sash and doors. For attaching zinc or stainless steel strips use cadmium or zinc coated nails or screws and copper nails or brass screws for brass or bronze strips.
5. The specifications which were prepared by the firm of architects which defendant engaged and which accompanied the invitation for bids (and subsequently constituted a part of the contract between plaintiff and defendant) read in pertinent parts as follows (underscoring and parentheses added):
DIVISION DI-IS 3
carpentry and millwork
1. Scope
Include in this division carpentry and millwork, flooring, siding, wallboard, storm sash, combination storm and screen doors, window screens, [7] rough hardware and all other work and material, except as specified in other divisions of this specification, of every nature required to complete the work under this contract. See the drawing and General Scope of Work for extent and location of work.
Hi ❖ H* ^ H*
s. Weatherstrips for (casement and double hung windows and for) [8] entrance doors shall be brass, bronze, zinc or stainless steel strips not less than .017 inches thick, one or two member, manufacturer’s standard type, providing a weather tight seal on all 4 edges of doors and casement and double hung sash. They shall adjust themselves to the swelling and shrinking of the sash and frames without impairing their efficiency or the easy operation of the sash and doors. For attaching zinc or stainless steel strips use cadmium or zinc coated nails or screws and copper nails or brass screws for brass *13 or bronze strips. Weatherstrips shall be provided for all doors, opening out, in service building.[9]
6. One of the drawings which accompanied the invitation for bids contained the notation:
METAL WEATHERSTRIPS
SEE SPECIFICATIONS
An arrow pointed from the notation to a window.
The drawing also contained a notation:
METAL SILL COVERING
An arrow pointed from the notation to a window.
The drawing indicated that the foregoing designations were to be uniform throughout all sidewall sections.
A metal sill covering is part of the weatherstripping of a window.
7. Article 1 of the contract entered into by plaintiff and defendant reads as follows:
Article 1. Statement of work. — The Contractor shall furnish the materials, and perform the work for the Construction of Defense Housing Project No. ME-1-D-l, at Presque Isle, Maine, as required by and in strict accordance with the “Specifications for the Construction of Defense Housing Project No. ME-l-D-1 to be erected at Presque Isle Air Force Base, Presque Isle, Maine”, dated March 12, 1952, as prepared by Frost-Kandzie Associates, 60 State Street, Boston 9, Mass., and in accordance with Addenda numbered 1, 2, 3 and 4 to such Specifications, dated March 24, 1952, March 26, 1952, March 26, 1952 and March 28, 1952, respectively, and in accordance with the contractor’s base proposal No. 3, dated April 2,1952.
for the consideration of One Million Four Hundred Forty-Seven Thousand Dollars, ($1,447,000)
in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof and designated as follows:
(a) Specifications for the Construction of Defense *14 Housing Project No. ME-l-D-1, dated March 12,1952; Addendum No. 1, dated March 24,1952, Addendum No. 2, dated March 26,1952; Addendum No. 3, dated March 26, 1952; and Addendum. No. 4, dated March 28, 1952; all of the aforegoing having been prepared by Frost-Kandzie Associates, 60 State Street, Boston 9, Massachusetts.
(b) Drawing X, and Drawings numbered 1 to 23 inclusive, as set forth in the Schedule of Drawings appearing on Page 68 of the Specifications dated March 12, 1952.
The work shall be commenced April 10,1952 and shall ■be completed September 11,1952, exclusive of Landscaping. An additional thirty (30) consecutive calendar days will be allowed in which to complete the Landscaping, exclusive of maintenance and replacement.
8. Article 2 of the contract entered into by plaintiff and defendant reads as follows:
Artioue 2. Specifications cmd drawings. — The contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the contracting officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. The contracting officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided.
No one on behalf of plaintiff submitted, to the contracting officer the matter of any discrepancy in the figures, drawings or specifications relating to the weather-stripping of windows.
9. The invitation for bids included in the instructions to bidders the following:
2. Interpretations
No oral interpretation will be made to any bidder as to the meaning of the Specifications, including the Drawings. Every request for an interpretation shall *15 be made in writing to tlie pubucc housing adm. (Defense Housing) at 141 Milk Street, Boston, Mass. Every interpretation made to a bidder will be issued as an addendum to the Specifications and sent by registered mail to each bidder of record, return receipt requested. All such addenda shall become part of the contract and all bidders shall be bound by such addenda.
No one on behalf of plaintiff requested an interpretation from the Public Housing Administration of the specifications.
10. Before submitting a bid, plaintiff’s president, Norman Leventhal, considered whether the contract specifications and drawings required weatherstrips for windows or only for doors. Plaintiff submitted a bid based upon a personal interpretation of the contract specifications and the drawings by Mr. Leventhal that weatherstrips were required only for doors and not for windows. The award was made to plaintiff and, as heretofore noted, the contract was entered into by plaintiff and defendant on April 9, 1952, and included the same specifications and drawings which accompanied the invitation for bids.
11. Under date of April 21,1952, plaintiff entered into a subcontract with Bush Prefabricated Structures, Inc. The subcontract provided, among other things, that Bush Prefabricated Structures, Inc., was to furnish work and materials, all in accordance with the prime contract, contract plans and specifications, as follows:
Division DHS 3 Carpentry and Millwork
*****
(h) Section 11s — Weatherstrips
Section 11s of Division DHS 8 is the weatherstrips specification of the prime contract set forth in finding 5, supra.
12. The word “sash” in the building industry is a generic term for a window. A casement sash is hinged on the side and generally opens out. A double-hung sash is the ordinary type of window which moves up and down. Storm sash is an additional sash (or window) which, together with the first sash, creates a double window for protection against severe weather. A weatherstrip is a strip of cotton, fiber or metal which is sometimes affixed to edges of doors and windows to keep out moisture and air.
*16 13. Bush. Prefabricated Structures, Inc., manufactured the window units, which were casement sash with storm sash, off the site. In good construction practice when weatherstripping is installed on windows, it is done at the time the windows are manufactured. In plaintiff’s understanding, it is not the practice to install both weather-stripping and storm sash on the same window units, even in the State of Maine. Weatherstrips were not installed on the windows. Bush Prefabricated Structures, Inc., furnished the weatherstripping for the doors but the installation of the weatherstrips on the doors was done by plaintiff. Weather-stripping on doors is usually installed after the doors are installed and painted.
14. Beginning in April 1952 and until November 1952 Edward Leventhal, general superintendent of plaintiff, spent full-time during working days at the jobsite of the Presque Isle housing project where he was in charge of construction. He familiarized himself with the contract documents, including the weatherstrip specifications and the drawing referred to in finding 6, supra, which contained the notation “metal WEATHERSTRIP see SPECIFICATIONS5’ and the notation “metal sill covering.” He concluded, after consultation with his brother Norman Leventhal, president of plaintiff, that weather-stripping for the windows was not required by the contract and specifications.
15. At virtually all times during the construction of the Presque Isle housing project, PHA maintained a project engineer on the jobsite who inspected the work in order to make sure that it met the contract specifications. In addition, officials of the Boston Field Office of PHA visited the jobsite from time to time in order to check on the progress of the work. At no time from the beginning of construction in April 1952 until January 1953 was there any discussion between representatives of the plaintiff and the defendant respecting weather-stripping of the windows; nor was there any correspondence between plaintiff and defendant on the subject matter during that period.
16. (a) On October 24, 1952, defendant transmitted to plaintiff two documents, each of which was entitled “Memo *17 randum of Acceptance for Occupancy”, which were signed on behalf of defendant by its project engineer. The documents recited that the Public Housing Administration had satisfied itself that the portions of the pro j ect therein enumerated were ready for occupancy and use. One of the documents stated that “This action completes acceptance of all 284 buildings on the project” but excepted certain work. The excepted work did not include weather-stripping of the windows. Both documents provided, however, that the acceptance was subject to contract stipulations. Edward Leventhal signed a statement on behalf of plaintiff on each document agreeing that occupancy of any building or portion of the project by the Public Housing Administration
* * * shall not constitute an acceptance of any work not not performed in accordance with the Contract, nor relieve the Contractor of liability to perform any work required by the Contract but not completed, at the time of occupancy, nor relieve the Contractor of liabilities with respect to any express warranties or guaranties required by the Contract.
(b) Article 6 (d) of the contract reads as follows:
Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in the specifications; and such inspection and acceptance, unless otherwise stated in the specifications, shall be final, except as regards latent defects, departures from specific requirements of the contract and the specifications and drawings made a part thereof, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. Subject to the requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site.
(c) Article 22 of the contract reads in part as follows:
Artiche 22. Alterations. — The following changes were made in this contract before it was signed by the parties hereto:
(a) The following subparagraph is added to articjue 6 hereof:
( e) Neither inspection, testing, approval or acceptance of the work, in whole or in part, by the Government or its *18 agent, shall relieve the Contractor or his Sureties of full responsibility for materials furnished or work performed not in strict accordance with the Contract Documents.
17. By November 1952 a number of the dwelling units were occupied by Air Force personnel, and Edward. Leventhal left the jobsite and was succeeded by an assistant “to clean up the extra work, the additional work that was given to us on change orders.”
18. On November 21,1952, defendant transmitted to plaintiff another document entitled “Memorandum of Acceptance for Occupancy”, signed, on behalf of defendant by its project engineer, and which was identical in form to the memoranda of acceptance of October 24,1952, except that the November 21, 1952 memorandum constituted an acceptance of landscaping and seeding subject to a reseeding, if necessary, in the spring. Edward Leventhal again signed a statement on behalf of plaintiff on the November 21, 1952 memorandum which was identical to the statements which he had signed on the October 24,1952 memoranda. The November 21,1952 memorandum concluded as follows:
DU’s Accepted:
Previously: 275 dwelling units, Administration Bldg., Service Bldg., Laundries, Eoads, Walks, Drives and Electrical, Water, Storm and Sanitary Systems.
This action: Landscaping and seeding.
Total to date: Entire Project.
19. On January 26, 1953, representatives of the Public Housing Administration from Washington, D.O., met at the project site at Presque Isle, Maine, with representatives of the Air Force and with officials of the Boston Field Office of PHA to exchange comments pertaining to design, project construction, eligibility of occupants, heating costs, rental rates, and related subjects in connection with operation of the project, and to make a physical inspection of the project. During the physical inspection on January 26 and 27,1953, it was noted, among other things, that the buildings were cold and the space heaters in use were inadequate to heat them; the windows were loosely fitted and in some instances the tenants *19 had placed paper along the edges of the windows in order to keep the air out.
20. A special report dated February 3,1953, to the Acting Deputy Assistant Commissioner for Development of the Public Housing Administration from one of the representatives of the Washington, D.C., office of PHA who had participated in the inspection, reads in pertinent parts as follows:
* * * several non-compliances were observed with respect to building construction such as the following that appear to be general and should be corrected or adjusted to accord with requirements of the construction contract:
‡ ‡ ‡ ‡
b. Storm sash and entrance doors should be adjusted to open and close properly. In many cases these items are not accurately fitted as required to conform to specified workmanship. See Div. DHS 3, Pars 6b and 61 of Specs.
H* H* # He
e. Weatherstripping should be installed on all 4 edges of windows. This item has been omitted but should be provided. See DIY, DHS 3, par 10s of specs.
♦fi H» iji H*
By correcting all non-compliances the dwelling structures can be made more weather tight and more livable, without question, at the same time this will provide added insurance against undue maintenance costs in the future life of the project.
‡ ‡ $ H:
Officers at the Air Base report temperatures have dropped to as much as 18 degrees below zero in Presque Isle and during the months of December, January, and February the thermometer registers near zero most of the time.
$ $ ‡ $
With respect to construction and related problems it is the intention of the Field Office of the PHA to have the Project Engineer return to the Project and to instruct the Contractor to come back and correct the deficient work before releasing final payment under the contract.
*20 21. A letter dated February 5,1953, addressed to plaintiff from tbe Acting Field Office Director of the Boston Field Office of PHA reads in part as follows:
In connection with the construction of Defense Housing Project ME 1-D-l, Presque Isle, Maine, an inspection was made by Washington personnel, and while the following is not complete, it contains a list of non-compliances noted:
Weather stripping of the casement, sash and double hung windows has been omitted.
The fit of the storm sash, casements and entrance doors is not in compliance with the contract nor is it satisfactory.
The caulking of the doors and casement windows has been omitted.
22. Upon receipt of the foregoing letter of February 5, 1953, plaintiff advised its subcontractor, Bush Prefabricated Structures, Inc., that defendant regarded the omission of weather-stripping of the windows as a non-compliance with the contract specifications; but plaintiff did not demand, that Bush Prefabricated Structures, Inc., furnish either the material or labor for weather-stripping the windows.
23. A letter dated February 13, 1953, addressed to plaintiff from the Acting Field Office Director of the Boston Field Office of PHA reads in part as follows:
Supplementing and enlarging upon our letter to you of February 5,1953 in connection with the construction of Defense Housing Project ME 1-D-l, Presque Isle, we make the following list of deficiencies:
1. Weather stripping was not installed in the casement or double hung windows of dwelling units and utility buildings. This omission must be corrected by the contractor. We refer you to Specifications, Division DHS-3, Paragraph 10s.
2. Every window and door in the project should he examined for compliance with contract in regard to fitting. All windows and doors which do not fit properly shall be replaced or corrected so as to comply with the contract requirements.
3. Storm sash do not fit properly throughout the project. All storm sash shall be refitted or replaced in accordance with contract requirements.
*21 4. Caulking was omitted at door and, window framing. These frames shall be caulked in accordance with contract requirements.
24. During the period from February 18 through February 25, 1953, another physical inspection was made of the Presque Isle project by representatives of the PHA from Washington, D.C., together with representatives of the Boston Field Office of PHA, and on February 19, 1953, officials of defendant met with officers of plaintiff at Presque Isle, at which time the officers of plaintiff disclaimed responsibility for weather-stripping the windows. On February 26, 1953, officials of defendant again met with officers of plaintiff in the Boston Field Office of PHA, at which time the officers of plaintiff agreed to correct certain of the items which defendant contended were non-compliances, including the refitting of doors and windows, and the caulking of the window frames. Plaintiff’s officers expressed the opinion that the specifications did not require weather-stripping of windows and that, therefore, plaintiff did not consider the failure to weatherstrip the windows as a non-compliance.
A special report, dated March 4,1953, to the Acting Deputy Assistant Commissioner for Development of the Public Housing Administration from one of the representatives of the Washington, D.C., office of PHA who participated in the meeting of February 26, 1953, reads in pertinent part as follows:
8. Framing of roof rafters to double 2 x 12 girder at bedroom ceiling — pulled away from girders in nearly every building creating a separation between end of rafters and blocking at girder. Open joints or separations vary from to %" in width. This is a matter of workmanship that should be corrected by contractor. Boof rafters at this point could collapse under heavy snow load. Contractor’s stand on this item is indefinite.

At the conclusion of the meeting in Boston the following remained as controversial items on which no definite commitment was made by the contractor regarding corrections as required by the contract and should be resolved without delay.
*22 Item 1. Installation of weatherstripping.
Item 3. Proper fit of storm sash with existing sash hangers.
Item 8. Additional support, 2x3 ledger or other method, to insure proper and tight connection of roof panels to double 2 x 12 girders in bed rooms.
Item 11. Grade of lumber required in 2 x 12 girders supporting roof loads over bed room.
25. (a) On April 17, 1953, plaintiff, through its counsel, submitted a letter to defendant’s contracting officer in which was set forth the position of plaintiff that the specification regarding weather-stripping of windows was not clear and that weatherstrips were not required under the contract; and requested a decision of the contracting officer under Article 15 of the contract.
(b) Article 15 of the contract reads as follows:
Aiiticle 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
26. On July 31,1953, the Boston Field Office of PHA was abolished and the supervision of the performance of plaintiff’s contract for the Presque Isle project was assumed by the New York Field Office of PHA.
27. Under date of August 14,1953, the contracting officer, a successor to the contracting officer to whom plaintiff’s counsel wrote in the letter of April 17,1953 (finding 25(a), supra), issued his decision that when the executed contract documents are read as a whole, there is no ambiguity and the furnishing and installing of metal weatherstrips on all casement and double-hung sash was clearly a contract requirement. The contracting officer instructed plaintiff to install metal weatherstrips on all casement and double-hung sash, and that plaintiff start such work within 5 days of receipt of the decision or be considered in default. The contracting officer further notified plaintiff that in the event plaintiff did *23 not proceed with the work as instructed, he (the contracting officer) would have the work done by others and charge the cost of the same to plaintiff’s account. The letter of August 14, 1953, was received by plaintiff on August 17, 1963. On August 27, 1953, the contracting officer notified plaintiff by telegram that plaintiff’s right to proceed with the window weather-stripping portion of the contract was terminated because plaintiff had not started that work as of August 24, 1953.
28. On September 24, 1953, plaintiff, through its counsel, requested a hearing on the appeal from the contracting officer’s decision of August 14,1953, and on September 30,1953, a hearing was held in Washington, D.C., at which plaintiff was represented by counsel and at which plaintiff’s president was present as well as representatives of the Public Housing Administration. Plaintiff called no witnesses and apparently the entire hearing was taken up with the oral argument of plaintiff’s counsel. At the conclusion of the hearing plaintiff’s counsel submitted a document entitled “Memorandum for Beacon Construction Company” in confirmation of the oral arguments he had presented.
29. Under date of September 3,1953, plaintiff filed an appeal with the Administrator of PHA from the contracting officer’s decision of August 14,1953.
30. (a) On September 10,1953, the contracting officer advertised for bids for the weather-stripping portion of the contract which had been terminated with plaintiff. Architects’ drawings and miscellaneous expenses in connection with the reletting of the contract for weather-stripping of the windows cost defendant $568.84. On October 15,1953, a contract for weather-stripping of the windows was entered into by defendant with another contractor to whom defendant paid $15,576.04, making a total expenditure for the window weather-stripping of $16,144.84 which was withheld by defendant from plaintiff.
(b) In addition to the $16,144.84 which was withheld by defendant from plaintiff, defendant withheld from plaintiff the sum of $100 “to keep the contract open.”
31. Under date of December 15,1953, the duly authorized representative of the Administrator of PHA rendered a *24 decision on plaintiff’s appeal, which decision was communicated to plaintiff’s counsel by letter which reads in pertinent parts as follows:
* * * we have for review on this appeal the matters presented to the Contracting Officer for his consideration in arriving at his decision of August 14, 1953, and whether or not his decision was consistent with the facts.
We have for consideration first whether the language contained in the contract documents is clear. Before extrinsic facts and circumstances may be considered, the primary resort in interpretation of contracts is to the language employed by the parties. Paragraph 11s of Division DHS-3 of the Specification is the only reference in the contract to the type and method of weatherstripping on windows and doors. Contract Drawing No. 5 captioned “Wall Sections and Details” contains the note “‘Metal Weather Strip See Specifications.” on the “Side Wall Section” which points to a location for metal weatherstripping on casement windows. The first sentence of the referenced paragraph, from which the ambiguity is said to result, concludes with the words, “provide a weather tight seal on all four edges of doors and casement and double hung sash.” The next sentence requires that the weather strips “shall adjust themselves to the swelling and shrinking of the sash and frames without impairing their efficiency or the easy operation of the sash and doors.” [Emphasis ours.] You appear to contend that all of these references to sash, which are unmistakable in the trade, are rendered meaningless by the fact that casement and double hung sash are not mentioned at every possible point in the paragraph. In this light, the pointed note on the detail drawing of a casement window, referring the contractor to the specifications for metal weatherstripping, would likewise have to be rejected as excess verbiage. It is extremely unlikely that a prudent contractor preparing a bid for a project to be built in northernmost Maine with its rigorous winter climate, would so treat the language of the specifications and the plans which include this note. Moreover, I can find no authority for wholesale disregard of words in a contract, except where a flat conflict between words or provisions exists, and you have not spelled out such a conflict. At best, you have pointed out that this provision might have been *25 written with greater clarity by the addition of several words.
You have advanced argument relating to Housing Project CONN-l-D-1, at Groton, Connecticut. It is my view that there is no ambiguity as would permit or require resort to evidence outside the four corners of the contract documents, and the fact that slightly different language was used in an advertised contract for a project in another state is not relevant.
You have also advanced argument that if weatherstrips are required by the provisions in the specifications, there is no indication as to the material of which they are to be made. Reading the contract documents together, the note on the plans indicates metal weatherstrips, and the paragraph in the specifications offers an option of four types of metal and states the method of installation.
Since your appeal of September 3, 1953, you have advanced the argument that the PHA did not intend to have weather stripping installed in the casement and double, hung sash. This argument is supported by an affidavit of a former Boston Field Office employee and an affidavit of one Clayton H. Heald, an estimator for Gregg & Son, Inc., dated October 1, 1953. I can give little weight to the ex-employee’s affidavit which is dated November 30, 1953, since our files disclose that the same employee prepared a letter of February 13, 1952 which demanded the correction by your client of a list of non-compliances in the project construction. Item 1 in this list is weatherstripping. If the November 30 affidavit is an accurate statement of the former employee’s recollection of his attitude toward the matter in controversy, there is no indication that his opinion was communicated to Beacon Construction Company or to any other bidder before the opening of bids and the execution of the contract. There is no showing of its materiality to this matter, or any claim that your client relied on it and was misled to his detriment.
The affidavit of Mr. Heald indicates that some question arose as to whether weather stripping was required in March 1952 and that he communicated with Mr. Kand-zie, one of the architects employed by PHA for ibis project. He states that Kandzie verbally advised that they were not required, and that in preparing his estimates he did not include any amount for the required machining. He also indicated that he communicated this information to Mr. Bush of the Bush Lumber Cor- *26 S oration and Mr. Bush eventually issued a purchase or-er to his company on June 9,1952 which did not include weather strips nor machining for same. We have examined your copy of the subcontract with Bush Prefabricated Structures Incorporated, dated April 21, 1952 which incorporated the provisions of your prime contract with the Government by reference. I can accord no weight in these circumstances to alleged reliance on an offhand interpretation of the contract where your client and his subcontractor were aware that any such interpretation, if doubt or conflict existed, was to be obtained from the Contracting Officer, and no one else. The failure to do so occasions the present difficulty, but it cannot alter the terms of the contract as executed, which as I have indicated, calls for the installation of the weatherstripping.
The evidence you have presented indicates that there may have been a mistake somewhere in the chain of the procurement of the windows for this project. It falls far short, however, of establishing that such mistake was mutual.
# * ❖ ❖ #
3. Routine inspections were made of the work on the project during the contract period, however, there is no record in my files nor has there been any report submitted to me that shows a final inspection has been made. Regardless of inspections or acceptance, Article 22(a) of the Contract provides that the Contractor has a continuing responsibility for work not clone in accordance with contract requirements. On January 26, and 27, 1953, an inspection of the project was made in which, among others, Messrs. Paul H. O’Donnell and R. S. Sweeley of the Washington Office of the Public Housing Administration, and Messrs. Neal J. Hardy and J. W. Clogston of the Administrator’s Office of the Housing and Home Finance Agency participated. This inspection disclosed a substantial list of non-compliances, and included the item of weatherstripping. These non-compliances were reported to the Contractor by the Contracting Officer on February 5,1953 and again on February 13,1953. The Contractor answered the Contracting Officer on February 13, 1953 disclaiming among other items, the responsibility for the lack of weatherstripping. This was the origin of the dispute now before me.
iH ‡ Hí sK #
Based on the data as submitted by you, by the Contracting Officer and as otherwise available to me, and *27 after a careful review and consideration of the weight of such data, it is my conclusion and I find and determine that:
a. The facts as found by the Contracting Officer in numbered paragraphs 1 to 6 inclusive in his decision of August 14,1953 are true.
b. There was no interpretation with respect to weatherstripping requested of or issued by the Contracting Officer prior to the bidding. Any determination on the part of bidders, based on oral information obtained from other than the Contracting Officer is the bidder’s responsibility and in nowise modifies or alters written contract requirements. (See Section 2 of the Instructions to Bidders.)
c. The executed contract documents constitute the full agreement between the parties and I find them free from conflict or ambiguity which cannot be resolved within the four corners of these documents. Accordingly, Guide Specifications issued to Architects and Engineers throughout the United; States and its Territories for adaptation to the needs of the project which they are designing, bidding documents for other projects in other localities, and opinions not expressed to all bidders before bidding and not incorporated in the contract documents are not determinative in this instance.
d. The contract documents require that metal weatherstrips are to be furnished and installed by the Contractor on all casement and double hung sash in the project.
e. The Beacon Construction Company is responsibile for all costs accruing to the Government because of their failure and refusal to furnish and install the above-mentioned. weatherstrips.
Accordingly, your appeal is denied.
ROOP PANELS AND GIRDERS
32. The letter dated February 5,1953, addressed to plaintiff from the Acting Field Office Director of the Boston Field Office of PHA (finding 21, supra), in listing the non-compli-ances stated:
* * * The separation of the roof panels and the girders supporting them in Bedroom No. 2 is unsatisfactory. * * *
33. The letter dated February 13,1953, addressed to plaintiff from the Acting Field Office Director of the Boston Field *28 Office of PHA (finding 23, supra), in listing deficiencies in connection with, the construction of the defense housing project at Presque Isle stated:
8. The framing between the roof rafters and the girder in the bedrooms does not conform to the contract requirements regarding workmanship and fit of material. An additional member ledger strip should be spiked to the existing girder to provide support for these improperly fastened roof panels or joists at no cost to the government.
* * ❖ ❖ *
11. Boof girders as specified under Change Order No. 10 are apparently not of the grade of lumber specified. These members shall be examined, together with a government representative, and where found to be of an inferior grade, shall be monetized providing an unacceptable structural weakness has not been incorporated in the work.
34. The body of a letter dated March 23, 1953, addressed to plaintiff from the Field Office Director of the Boston Field Office of PHA reads as follows:
You have previously been notified that there is a certain deficiency in the separation of roof panels from the supporting bedroom girder. You are herewith ordered to correct this structural deficiency. This correction is to be done in accordance with the enclosed drawings Nos. B.-1 and Br-2, dated March 19, 1953. These drawings show the required strengthening at the bedroom roof girder and in the adjacent storage closet where separation has occurred at the panel junction.
In connection with this correction we find that it will be necessary to provide a roof tie which will prevent further separation of the panels from its supporting girder. This, however, is considered additional work for which you will be recompensed. Drawing B-3 is enclosed showing in detail the work to be done, as this is a part of the separation of the roof panels from the girder which should be done at the same time.
We wrote to you on March 16,1953 in comiection with the splitting of the bedroom roof girder. We are enclosing Drawing B-4 dated March 19, 1931 [sic] which shows a detail for this reinforcing which will be satisfactory to this office. As this will also form a part of the separation of the roof panels from the girder, it can *29 not be handled separately. It must be done at the same time. This is considered a deficiency in construction and you are herewith ordered to do this work.
In connection with the above work it will be necessary that all new lumber in the bedroom ceiling shall be painted. It will not be necessary to paint the new lumber in the storage closet. This painting can be done before or after erection, whichever you decide is most convenient.
We are enclosing six copies of the above noted drawings for your use in the office and in the field. Please submit, as soon as possible, a price for the installation of the roof ties mentioned above and shown on Drawing R-3.
Enclosed with the letter were the four drawings referred to in the letter.
35. By letter dated April 1,1953, plaintiff submitted to defendant detailed proposals for additional supports for the roof panels as shown in drawings R-l and R-2 which were enclosed in the letter of March 23,1953, from the Field Office Director of the Boston Field Office of PHA (finding 34, supra). By letter dated April 6, 1953, plaintiff advised defendant that plaintiff would proceed with the work of the additional supports for the roof panels but without affecting plaintiff’s rights to make claims for payment.
36. By letter dated April 9, 1953, plaintiff submitted a separate breakdown for the installation of the roof girder tie rods shown in drawing R-3 which was enclosed in the letter of March 23, 1953, from the Field Office Director of the Boston Field Office of PPIA (finding 34, supra). This breakdown was a statement of the materials, trucking, equipment, and labor unit costs which, together with insurance, overhead, and profit, totalled $1,487.75.
37. On the same date, April 9,1953, plaintiff wrote to the Field Office Director of the Boston Field Office of PHA as follows:
At our conference on Monday, April 6, 1953, we believe that we made it sufficiently clear that the provision of additional supports as ordered in your letter of March 23, 1953, was not our responsibility. It was stated orally that we considered that this order probably involved a dispute within the meaning of Article 14, page
*30 24, of the contract. We asked, therefore, that you rule as contracting officer on this dispute.
This letter is simply to confirm that oral request.
Plaintiff did not receive a reply to the foregoing letter of April 9, 1953.
38. Under date of April 13, 1953, defendant issued, and under date of April 15, 1953, plaintiff accepted, Change Order No. 44 for the installation of roof girder tie rods shown on drawing No. B-3 which was enclosed in the letter of March 23,1953, from the Field Office Director of the Boston Field Office of PHA (finding 34, supra). Change Order No. 44 increased the contract price by $1,487.75.
39. By letter dated July 6, 1953, plaintiff sent defendant estimates for additional supports for the roof panels as shown in drawings Br-1 and E.-2 which were enclosed with the letter dated March 23, 1953, from the Field Office Director of the Boston Field Office of PHA (finding 34, supra). The estimate for the roof girders (drawing P-1) was $2,268.84 and the estimate for junction of roof panels (drawing B.-2) was $1,242.50, making a total of $3,511.34.
40. The evidence establishes that the work which defendant ordered plaintiff to do on the roof panels and girders (finding 34, supra) was thereafter properly performed by plaintiff and the fair value of the work (including materials), based on time studies conducted under scrutiny of defendant, were the amounts submitted by plaintiff to defendant, namely:
Installation of roof girder tie rods (covered by Change Order No. 44)_$1,487. 75
Roof girder supports_ 2,268. 84
Junction of roof panels_ 1,242. 50
total _$4, 999.09
41. As was previously noted (finding 26, supra), on July 31,1953, the Boston Field Office of PHA was abolished and the supervision of the performance of plaintiff’s contract for the Presque Isle project was assumed by the New York Field Office of PHA.
42. (a) The body of a letter dated April 19, 1954, addressed to plaintiff from the Acting Director of the New York Field Office of PHA, reads as follows:
*31 This letter is in reference to the separation of roof panels from the girder over bedrooms in the houses at Project ME-l-D-1, Presque Isle, Maine, constructed by your company under Contract No. B(G)DH-Dev. 3.
Further investigation has established that only two nails were used in joining the panel headers to the rafters at the girder over bedrooms where roof panels R2, R2A and R3 join to roof panels BIB.
Examination of the Specification discloses that Division DHS-3, Section 1, Paragraph b(l) requires that “. . . Details of panel connections shall be as shown on the plans . . .”.
Sheet No. 10 dated March 12, 1952 of the contract drawings which modifies Sheet No. 3, dated “Dec. 19, 1951,” on sections captioned “Modification to Roof Panels — Sheet No. 3”, particularly at the right end of Section B-l, bears the note “Typical Nailing — 1" x 6" Header to 2" x 8" Rafters 3-12d nails.” The evident meaning of this note is that the header at the ends of the rafters in roof panels was to be end nailed into the rafters with 3-12d nails at time of building the roof panel and before assembly of the roof as a whole. This is confirmed by the details of Roof Panel Frames shown on Sheet No. 3 which shows headers in place on both ends of the “Frames” or panels. It is recognized that the use of 3-12d nails at the eave ends of the rafters on panels R-2, R-2A and R-3 is not feasible, but this fact does not modify their use at points where their use is feasible.
_ The separation of the rafters from the headers at the girders over bedrooms in some cases was so great that there was danger of collapse of these roof panels into the bedrooms with the additional risk of bodily harm to tenants. This separation had originally been reported as a non-compliance with contract terms in that the required nailing had not been used. When this was brought to your attention, you disclaimed responsibility on the basis of faulty design. Where the more dangerous cases existed the contracting officer required correction in accordance with Drawing No. R-3 dated March 19, 1953 and subsequently issued Change Order No. 44 in the amount of $1,487.75 to reimburse you for this work. The contracting officer also issued Drawings INI, R-2 and R-4 dated March 19, 1953 and ordered correction therewith. You corrected the conditions as shown by Drawing R-4 at your own expense but for those conditions covered by Drawings R-l and R-2 you *32 disclaimed responsibility and have claimed payment for this work in the amount of $3511.34.
Boughly, the withdrawal resistance of one 12d nail having 214" penetration in end grain of seasoned wood of this species, is about 175 lbs. In unseasoned wood the holding power is substantially increased. This means that the omission of the one 12d nail in each rafter reduced the strength of the tie between the rafters and the girder, for the length of the girder, by about 2100 lbs. To say this another way, the omission of one 12d nail reduced the tendency of the rafters and girders to hold together by at least one third. The omission of one 12d nail in this location constituted a non-compliance with contract terms and the fact that, to install this nail afterward would require the dismantling of roofing, roof framing and girders, justifies the Contracting Officer’s action in requiring a practical alternative method of correction. On the other hand, however, as contractor your position in disclaiming responsibility on the basis of design is unsound because you did not construct the work in accordance with the design shown.
It appears then that the full responsibility for correcting the separation of roof rafters from their headers is yours because of the non-compliance in nailing at this location. Based on this opinion, we hereby rescind Change Order No. 44 amounting to $1487.75 issued April 23, 1953 to reimburse you for the work done in accordance with Drawing No. B-3 dated March 19, 1953 and we decline to issue a Change Order for the work amounting to $3511.34 done in accordance with Drawings Nos. B.-1 and B-2 for which you claim reimbursement.
(b) Plaintiff did not appeal from the decisions recited in the foregoing letter dated April 19, 1954.
(c) Article 3 of the contract reads as follows:
Article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative.
*33 Any claim for adjustment under tbis article must be asserted within 10 days from the date the change is ordered: Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If •the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
(d) Article 15 of the contract, entitled “Disputes”, is set forth in finding 25(b), sufra.
43. (a) The body of a letter dated February 23, 1956, addressed to plaintiff from the Director of the New York Field Office of PHA, reads as follows:
This is with further reference to your letter, dated February 15, 1955, relative to the separation of roof panels from supporting girder on Project ME-l-D-1, Presque Isle, Maine.
The material you submitted has been carefully reviewed and we have found that you did not execute the work as required by the contract.
Therefore, our determination of April 19, 1954 is reaffirmed as follows:
(1) Change Order No. 44, dated April 23, 1953, in the amount of $1,487.75 is rescinded.
(2) A Change Order in the proposed amount of $3,511.34 for work done in accordance with Drawings Nos. R-l and Kr-2 for which you claim reimbursement will not be issued.
(b) Plaintiff did not appeal from the determination announced in the foregoing letter dated February 23, 1956.
44. At the trial plaintiff’s president, Norman Leventhal, testified to the effect that the separation of the roof panels was due to a design deficiency in that the drawings and specifications called for fastening of vertical boards to horizontal rafters by nailing through the vertical boards without other vertical support to the rafters. He further testified that plaintiff installed the roof panels and the rafters exactly in accordance with the drawings and specifications. Plain *34 tiff failed, however, to produce evidence on the specific omission of the one 12d nail in each rafter as alleged in the letter dated April 19, 1954, addressed to plaintiff from the Acting Director of the New York Field Office of PHA (finding 42(a), supra), which omission “reduced the tendency of the rafters and girders to hold together by at least one third.”
The evidence does not establish that the administrative determination that the roof panel separation was caused by plaintiff’s non-compliance with the contract was fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith; or that such determination was not supported by substantial evidence.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover only a small part of its claim, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of one thousand four hundred and eighty-seven dollars and seventy-five cents ($1,487.75). Otherwise the petition is dismissed.

 There is no claim, as there could not be under the contract, that the Government’s acceptance of the project precluded it from recovering for deviations from the specifications. But the plaintiff does argue that the absence of weather-stripping on the windows must have been apparent to defendant’s inspectors, and yet they never referred to it during the course of construction; plaintiff infers that these men did not believe such stripping to be required. Defendant’s response is that its representatives expected the strips to be installed at the very last stage of performance, just before (or even after) the painting of the exterior of the window frames and doors; the brief points out that weather-stripping of doors is usually done after the doors are installed and painted. Plaintiff replies that it is good construction practice to install weather-stripping on windows at the same time the windows are manufactured, before they are installed in the building — and that the Government’s inspectors must have been aware of this practice.

 The standard-form specifications supplied by P.H.A. to the architects who drew the specifications for the Presque Isle project provided for weather-strips for casement and double-hung windows, in addition to entrance doors. The architect testified at the trial that the omission of the reference to the windows was the result of inadvertence or a stenographic error, not a purposeful omission. On the other hand, a witness for plaintiff — formerly employed by P.H.A. but an employee of plaintiff at the time of trial — testified that it was P.H.A.’s intention to omit weather-stripping for windows and that the inadverence was the failure to correct the rest of the specifications and the drawings to accord with that aim. It is unnecessary to resolve this conflict.

 The testimony of plaintiff’s president makes it clear that he noticed the ambiguity at once. Moreover, in the administrative proceedings before the Public Housing Administration, plaintiff supplied an affidavit of an estimator for Gregg & Son, Inc. (a subcontractor of Bush Prefabricated Structures, Inc., which made the window units for plaintiff) which showed that plaintiff’s window subcontractors were aware, as early as March 1952, of the ambiguity and sought to settle it by speaking to the architects who had drafted the specifications for P.H.A. Plaintiff’s contract with the Government was made on April 9, 1952.

 Or that these contract provisions apply where a possible ambiguity is readily resolved by a reading of the contract as a whole.

 On this record and under the practice and conditions of this contract, we find that this change was sufficiently approved within the requirement of the Changes article that contract increases of more than $500 shall not be ordered unless approved in writing by the head of the department or his duly authorized representative.

 The term “design temperature” means the temperature outside the building -with which the heating unit must be designed to cope. The design temperature at Presque Isle, Maine, was —20° F.

 The underscored words did not appear In the “Scope" paragraph of the bulletin furnished the firm of architects by the Boston field oflice of PHA.

 The words In parentheses were in paragraph “s. Weatherstrips” of the bulletin furnished the firm of architects by the Boston field oflice of PHA, but did not appear in paragraph “s. Weatherstrips” of the specifications which were prepared by the firm of architects.

 The underscored words did not appear in paragraph “s. Weatherstrips” of the bulletin furnished the firm of architects by the Boston field office of FHA.