**READY–MIX CONCRETE COMPANY, Ltd.,**
v.
**UNITED STATES.**
No. 49279.

United States Court of Claims.
Jan. 15, 1958.

572

See also, 131 Ct.Cl. 204, 130 F.Supp. 390.

O. R. McGuire, Jr., Washington, D. C., for the plaintiff. Hogan & Hartson, Washington, D. C., were on the brief.

John R. Franklin, with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Gerson B. Kramer, Silver Spring, Md., was on the brief.

MADDEN, Judge.

The plaintiff on June 23, 1944, made a contract with the United States to supply crushed rock and gravel of various types during the fiscal year 1945. The rock was to be supplied "in such quantities and at such times as ordered by" any one of several officials, named only by their titles, who were the supply officers of various activities of the United States Navy on the Island of Oahu, in Hawaii. The contract contained a tabulation of estimated quantities, and a statement that these figures were given for information only, since it was "impossible to determine the quantity or quantities of the articles and materials described herein that may be required during the contemplated period of the contract." It said further that the supplies would be ordered "in such quantities * * * as the needs of the Naval Service require."

The contract here involved was a "requirements" contract, that is, a contract which bound the supplier to furnish, and the purchaser to accept from the supplier, whatever of the specified materials the purchaser needed during the period of the contract. Johnstown Coal and Coke Co. v. United States, 66 Ct.Cl. 616; Gemsco, Inc. v. United States, 115 Ct.Cl. 209.

The plaintiff was engaged on the Hawaiian Island of Oahu in the business of producing and selling ready-mixed concrete and also crushed rock and sand. It had had, since 1941, a series of "requirements" contracts with the Navy for the supply of crushed rock for various construction projects at the Kaneohe Naval Air Station on the eastern side of the island. Honolulu is on the opposite side of the island, and it is some fifteen miles by road from the Naval Air Station to Honolulu, there being a mountain range between the two places. In order to service its Navy business without making this long haul, the plaintiff established a quarry near the Naval Air Station. The main economic activity on the island was in the Honolulu area.

In the performance of its earlier contracts, the plaintiff had been able to keep posted as to the probable needs of the Navy, and to supply those needs satisfactorily. As we have seen, the contract involved in this suit was for the year July 1, 1944, to June 30, 1945. In July of 1944, the plaintiff, having on hand an inventory of more than 40,000 tons of crushed rock, shut down its plant. By December 1944, this inventory was reduced to about 6,000 tons, but the plaintiff was not aware of any early need for more rock. However, the Government had authorized additional construction projects which would use up some 66,000 tons of rock. One of these projects was a runway extension which would require about 40,000 tons.

The plaintiff, being unaware of these new projects, had no plans for the resumption of quarrying and crushing. A Mr. Pruyn was a project engineer employed by Pacific Naval Air Bases (PNAB) a group of local specialists which assisted the Navy's construction battalions, the "Seabees", in obtaining materials for their construction projects. Mr. Pruyn kept in touch with the plaintiff and other suppliers of the Navy's construction projects to see that they had adequate supplies on hand to meet

anticipated needs. Mr. Pruyn, having observed that the plaintiff's supply of crushed rock was low, telephoned the plaintiff's assistant manager, Mr. Winstedt, in December 1944, and told him that the plaintiff's supply of rock was insufficient, that the runway extension was to be built, as well as various concrete structures. Pruyn was asked how much rock would be needed and he estimated 40,000 tons for paving the runway and 15,000 tons for other structures. He told Winstedt what particular sizes of rock would be needed. He said that the Seabees would do the construction work and would take delivery of the rock at the plaintiff's stockpile. He said that the Seabees would mix the rock into asphaltic concrete at a hot-mix plant which the Navy had leased from the Hawaiian Bitumuls Company, which plant was located near the Naval Air Station; that once the Seabees started paving, which would be in about two months, they would pave without interruption, and that the plaintiff should go ahead and crush additional rock so that it would be available when needed.

Winstedt told Pruyn that he wanted "some confirmation of this" and Pruyn replied "you will get an order in due course." Winstedt informed Mr. Makin, the plaintiff's general manager and later president, of the conversation with Pruyn, and Makin issued orders for the resumption of quarrying and crushing operations as soon as the necessary preparations could be made.

On January 11, 1945, the contracting officer wrote the plaintiff amending the contract by increasing the quantities of rock named in it by 69,000 tons. The amendment said "All other conditions and specifications remain in full force and effect."

The plaintiff resumed operations early in January, before receiving the communication from the contracting officer. As soon as the necessary personnel could be recruited, a double shift operation was commenced, in order to be ready to meet the anticipated urgent needs for the crushed rock. By March 17, a total of 57,670 tons had been produced.

On March 12, Mr. Brouk, another employee of PNAB, telephoned Winstedt that the Seabees had been ordered from Hawaii to a forward area, that the Navy would not need any more of the plaintiff's rock for construction purposes, and that the plaintiff should not crush any more rock for the Naval Air Station project. Brouk said that his oral statement would be confirmed by a letter. No such letter was received by the plaintiff. Makin, the plaintiff's president, waited a few days for the letter, then closed the operation down on March 17.

The Seabees were transferred from Hawaii to a forward area. The Navy surrendered its lease of the asphalt mixing plant to the Hawaiian Bitumuls Company. The Navy made a contract with the Hawaiian Dredging Company for the paving of the runway. The contract did not specify where that contractor should obtain its rock for the runway. The Dredging Company, with the approval of the Navy, subcontracted to its wholly owned subsidiary, the Hawaiian Bitumuls Company, the paving of the runway.

Bitumuls had two asphalt mixing plants, the one on the Naval Air Station side of the island, which the Navy had surrendered to it when the Seabees were moved out, and one on the Honolulu side of the island. It did not have sufficient manpower to operate both, and it chose to operate the one on the Honolulu side, obtaining its rock from a quarry and crusher on that side and hauling the mixed asphalt concrete around the mountain to the runway. It used some 30,000 tons of crushed rock for the job, which was not finished until April 1946. We do not know how much of this was used before June 30, 1945, which was the last day of the plaintiff's contract period.

When the plaintiff stopped its operation on March 17, 1945, it had in its stockpile about 50,120 tons, all but 1,918 tons of which was of the sizes suitable for the runway paving job. In a letter

dated March 26, it demanded that the Navy accept and pay for its entire stockpile because, as the letter said, the rock had been produced "on what amounts to a special order from the Navy." The Navy's contracting officer rejected the plaintiff's demand, saying that the rock had not been ordered and that "Unless and until there is a requirement for the material and orders have been placed for it as provided in the Contract, the Navy is not obligated to accept delivery of the material." The plaintiff took an appeal from the contracting officer's decision to the Board of Contract Appeals of the Navy Department.

The Navy, during the January to June 1945 period, bought some 21,000 tons of rock from the plaintiff for construction projects other than the one at the Naval Air Station. This rock was taken from the stockpile. The plaintiff sold some 6,000 tons from the stockpile to other persons during the January to June period. At the end of the contract period on June 30, 1945, the plaintiff still had in its stockpile some 34,000 tons of rock of the sizes suitable for the Navy's runway and other projects. During the following three years the plaintiff sold to other persons 24,771.79 tons of the rock with which we are concerned, but at prices less than the Navy contract prices, and with greatly increased selling expense. The rest of the stockpile deteriorated to the extent that it became unsaleable.

The Board of Contract Appeals made its decision on July 25, 1946. It decided that Pruyn's telephone call to the plaintiff in December 1944 was "merely informative" in character, that the contract amendment made January 11, 1945 by the contracting officer was merely an increase in the estimates stated in the original contract, and that Brouk's call to the plaintiff in March of 1945 was not a termination of the contract for the convenience of the Government, but was merely advice that there was an anticipated decrease in the Navy's requirements.

From the above recital it is apparent that the plaintiff has, without any fault on its part, suffered a large loss as a result of its dealing with the Government. Our question is whether its loss is legally recoverable.

■ The contract said that the Government should pay for the rock which it would require and which the contracting officer should order. The Government says that the contracting officer did not order the rock which the plaintiff produced. We think he did. He authorized Mr. Pruyn to contact suppliers and say to them what Pruyn did in fact say to them. There can be no question that Pruyn reported to the contracting officer what he had said to the plaintiff. What he had said was the only thing that could sensibly have been said, in the circumstances. The Navy proposed to pave a runway, and to do the work in an expeditious and economical way. It did not propose to have its battalion of Seabees waiting around while crushed rock dribbled from the quarry and the crusher. The only way to insure that the rock would be ready was to order it, and Pruyn did order it. The plaintiff asked that the telephone conversation be confirmed and Pruyn reported the conversation to the contracting officer. If the contracting officer was not willing to confirm what Pruyn had said, good faith would have required him to so advise the plaintiff. He did not do so, but instead sent the plaintiff the amendment to the contract. The amendment used substantially the same tonnage figures which Pruyn had used in his telephone conversation, and thus indicated to the plaintiff that it was the confirmation which he had requested.

The statement at the end of the contract amendment "All other conditions and specifications remain in full force and effect", to which the Government points in this suit, had plenty of room for play without its being a concealed repudiation of Pruyn's order. There were numerous conditions and specifications in the contract none of which where repeated in the amendment, and which were, of course, intended to be applicable to the amendment.

Taken literally, and in disregard of the circumstances, the amendment might be regarded as a mere increase in the estimated quantities of the contract, an increase in the Government's rights to call upon the plaintiff for crushed rock if it should happen to want it, but giving no assurance to the plaintiff that the rock would be taken or paid for. In the circumstances, the amendment cannot have meant that.

If the contracting officer had really meant to repudiate rather than to confirm the order which Pruyn had given to the plaintiff, he should, in good faith, have advised the plaintiff as follows. "We plan to use some 65,000 tons of crushed rock in the second half of your contract year. With your facilities, of which we were aware when we made our contract with you, you will have to crush and stockpile large quantities of this rock, since your contract requires you to deliver it within 48 hours after we order it. We realize that if you crush a large quantity of this rock and we do not take and pay for it, you have, in your isolated position, no other market for it. But I must, in fairness, warn you that we are not obligated to take nor pay for one ton of this rock, if our circumstances should change so that we do not need it. Be sure to have this in mind when you consider whether you will accept our proposed amendment of your contract, increasing greatly the amounts of rock which we may demand from you, but not increasing at all our obligation to take and pay for the rock."

The contracting officer, of course, had no such intention. He did not foresee the possibility that the authorized and projected work would not be done. In prior years, what was planned was done, and the contracts with the plaintiff were performed and settled without controversy. This year, with a projected greatly increased use of rock concentrated in the last few months of the year, he knew that the rock would not be available unless it was ordered in advance and he ratified, both by silence and by conduct, the order which Pruyn had given the plaintiff.

When the Seabees were ordered out of Hawaii and the Navy's plans had to be changed, the contracting officer put his mind on the legal consequences of what had occurred. In a spirit of humanity, he had the Navy's agent, Brouk, tell the plaintiff what had happened, but as to fulfilling Brouk's promise that his conversation would be confirmed in writing, he exercised the better part of valor and did not write.

When the Seabees were moved out, the Navy still wanted to have the runway built. As we have said, the Navy had the work done by contract. So far as appears, it, in negotiating the contract, gave no consideration whatever to the plight in which it had left the plaintiff. The plaintiff's stockpile of rock, accumulated at the request of the Navy, was near the runway. An asphalt mixing plant belonging to the contractor was also on that side of the island. Yet the Navy made a contract which permitted the contractor to buy its crushed rock on the other side of the mountain, mix it there, and haul the asphalt concrete fifteen miles around the mountain to the runway. This apparently completely inconsiderate action contributes no equity to the Government's side of this case. It is worthy of note that, in negotiating the runway contract, the Navy specified that the contractor should obtain its asphalt from the Navy. If it had not so specified, the Navy would have been in the same unfortunate position as to the asphalt which it had accumulated for the job, as the plaintiff was in as to the crushed rock.

■ Our conclusion is that the Government ordered, and was obligated to accept and pay for, the 57,670 tons of crushed rock which the plaintiff produced after the giving of the order as well as the 6,000 tons which it had on hand when the order was given. As we have said, the Government did take and pay for some 21,000 tons of this rock. The proceeds of the sale of some of the remaining rock to third persons, less the necessary expenses incurred in so disposing of the rock, will be deducted as a

mitigation of the damages caused by the Government's breach of contract.

The plaintiff, in its first count, claims that it should recover the profits which it would have made if it had crushed, and the Government had paid for, all the rock specified in the amended order. When the plaintiff was notified to stop crushing, it still lacked 20,836.1 tons of the amount so specified. As we have said, it seeks to recover the profit which it would have made on this amount.

Our conclusion that Pruyn's conversation and the contracting officer's conduct and writing amounted to an order would seem to justify the plaintiff's contention. To reach that conclusion, we gave great weight to the circumstances. We think the same circumstances justify us in interpreting the order as being subject to cancellation to whatever extent it had not been acted upon by crushing rock, at the time notice of cancellation was given.

In computing the plaintiff's expenses in disposing of the remaining rock, there is a question with regard to equipment rental. The process of liquidating the plaintiff corporation began in 1945, and the title to the power shovel which was used in loading out the crushed rock from the stockpile was transferred to Mr. Makin, who was the plaintiff's sole stockholder. No lease or other express arrangements for the plaintiff's compensating Makin for the use of the shovel was made. The Government says that the plaintiff is entitled to no allowance for the use of the shovel, after the title passed to Makin, because the plaintiff did not own the shovel and did not pay nor promise to pay anything for its use. There is, of course, no intimation in the record that the plaintiff or Makin intended to, in effect, make a gratuitous contribution to the Government, on whose account it was, really, selling and shoveling the rock. If there had been a payment of rental from the plaintiff to Makin it would have been as significant as shifting money from one pocket to the other. The same would have been true of a promise to pay. We hold that the fair rental value of the shovel for the entire period of disposition is an allowable expense.

The Board of Contract Appeals of the Department of the Navy affirmed the contracting officer's decision that the plaintiff had no claim. This case involves the construction of the contract, a "question of law." There is no real dispute as to any fact. The finality provision of the contract is not applicable.

### The Counterclaim

In 1948 the United States Department of Labor filed a complaint against the plaintiff under the Walsh-Healey Public Contracts Act, 41 U.S.C.A. §§ 35–45 for failure to pay overtime wages to its employees who worked on Government contracts. Hearings on the complaint were had before a Hearing Examiner, and much oral evidence and many records and documents were received in evidence. The Hearing Examiner on May 11, 1951, made a finding that the Act had been violated during the performance by the plaintiff of several contracts, including the contract here in litigation. He concluded that the plaintiff was liable to the Government in the amount of some $22,000 under the applicable provisions of the law. The Hearing Examiner's decision was reviewed by the appropriate superior who revised it somewhat and decided that the proper amount of the plaintiff's liability was $19,908.58. The Government has interposed a counterclaim for that amount in this case.

In an earlier consideration in this case of the question of the counterclaim, we held that affirmative enforcement of the counterclaim was barred by the statute of limitations, but that it would be treated as a defensive measure, the amount claimed in it being capable of being set off against any amount which might be found to be otherwise due to the plaintiff. Ready-Mix Concrete Company, Ltd. v. United States, 130 F.Supp. 390, 131 Ct.Cl. 204, 210. Since we do find

the Government liable to the plaintiff, we now consider this setoff.

The Walsh-Healey Act in section 39 of 41 U.S.C.A. states that the findings of the Department of Labor "if supported by the preponderance of the evidence, shall be conclusive in any court of the United States." We think that when a statute provides for an administrative trial of questions of fact, and such a trial has been had, and the administrator has made findings, Congress did not intend that the administrative proceeding should go for naught. Since the instant statute, unlike many others, makes the administrative findings conclusive only if they are supported by a preponderance of the evidence, the administrative proceeding would go for naught if it did not, when the case is taken to court for enforcement, at least shift the burden of going forward with the evidence to the party against whom the administrative decision went.

■ The commissioner of this court concluded that he could not determine whether or not the Labor Department's findings were supported by the preponderance of the evidence. He said that those findings stated the amounts by which the plaintiff's payments of wages were deficient as to each of 214 hourly wage employees and 35 salaried employees during a five-year period of performance of Government contracts. But, he said, the findings "do not state the specific days or weeks when the respective employees performed overtime work for which they were not properly compensated, the amount of time that the employees worked on such occasions, the employees' rates of pay at the pertinent times, and the amount of compensation (if any) that the employees received for their work during the pertinent days or weeks."

If the Labor Department's findings had contained all the detail, the omission of which is adverted to by our Commissioner, they would have constituted a bulky document indeed. In United States v. Pierce Auto Lines, 327 U.S. 515, 529, 66 S.Ct. 687, 695, 90 L.Ed. 821, the Court said, " * * * the Commission is not compelled to annotate to each finding the evidence supporting it." If our commissioners embodied in their reports supporting details such as the commissioner has referred to in this case, the bulk of these reports would be increased to a great, perhaps to an intolerable degree. The reason why it would not be useful to embody such detail is that nearly always our commissioners' findings are correct, and the occasional case in which a finding may be incorrect is more economically left to be called to our attention by the party who thinks it is incorrect. When he does so, he details for us the evidence relating to the point.

All triers of fact have to take many things on faith. That faith is justified if it is faith in a finding to which no one has taken exception, or if an exception has been taken, the party taking it does not point out wherein the finding is wrong. In the instant case the Labor Department made findings that particular employees were underpaid by determined amounts. We have no reason to suppose that those figures were drawn out of a hat, rather than compiled from work sheets based on evidence. We do have reason to suppose that if the figures were not in accordance with the evidence which was before the department, the plaintiff would tell us so, and point out wherein.

If all the detail to which our commissioner adverts had been contained in the findings, we would still have to take them on the faith that if they were not correct the plaintiff would tell us wherein they were not correct. If one fears that other Government agencies make findings by unauthorized methods, he must remember that detailed findings, as well as more general findings, could be made by such methods. It would only take longer to make them.

Other courts have held that when the United States sues an employer to collect the amounts found by the Department of Labor to be due for violation of the Walsh-Healey Act, the employer has the burden of showing wherein the adminis-

trative determination was wrong. United States v. Sweet Briar, D.C.W.D.S.C., 92 F.Supp. 777; United States v. Hudgins-Dize Co., D.C.E.D.Va., 83 F.Supp. 593.

In the writing of pleadings, one must steer the ill-defined course between stating over-naked legal conclusions, on the one hand, and reciting evidence, on the other. Likewise, it is not possible to lay down a rule of more than very general application as to when findings are too scanty and when they are too detailed. This court, in the case of Snake or Piute Indians, etc. v. United States, 112 F. Supp. 543, 125 Ct.Cl. 241, 248 ff., discussed the applicable general principles, and applied them to the particular situations involved in that case. The lesson to be drawn from The Snake or Piute case, and from other cases such as Kelley v. Everglades District, 319 U.S. 415, 420, 63 S.Ct. 1141, 87 L.Ed. 1485, and Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App.D.C. 282, 96 F.2d 554, is that the adequacy of the findings must be determined with regard to the nature of the case. A naked finding that a plan for the composition of debts is "fair, equitable and non-discriminatory," Kelley v. Everglades, or that the granting of a broadcasting license would not be "in the public interest," Saginaw Broadcasting, presents a problem different from a finding that employer A failed to pay employee B a stated number of dollars for overtime worked in the performance of certain contracts.

In our earlier consideration of this case, 130 F.Supp. 390, 131 Ct.Cl. 204, we concluded that the withholding right given to the Government by section 36 of the Walsh-Healey Act permitted the Government to withhold against amounts due a contractor on one contract, amounts due the Government for violations of the Walsh-Healey Act by the contractor in the performance of other contracts covered by that Act. The plaintiff, however, now calls our attention to a regulation issued by the Secretary of Labor which regulation was incorporated into the contract involved in this suit. 41 C.F.R. 201.1(f). The pertinent part of this regulation reads as follows:

"Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts *due on the contract* or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof." (Italics supplied.)

The plaintiff says that the Government's making this regulation a term of the contract gave up the right of the Government, conferred upon it by section 36, to withhold amounts owed by the plaintiff for violations committed in the performance of other contracts.

Section 38 of the Walsh-Healey Act authorized the Secretary to "make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of" the Act. We would have serious doubts as to whether the Secretary had the power to surrender, by regulation or by contract, a right reserved to the United States by statute. In any event we think the Secretary did not intend to do that. The regulation was written as a direction to contracting officers as to what to incorporate in their contracts, so far as the Walsh-Healey Act was concerned. It was not intended to state all the legal consequences which would result from a breach of the statute. It was, naturally enough, limited to notifying the contractor that if he violated the Act in the performance of the contract, his pay under the contract would be reduced by the amount necessary to compensate for his violation. To tell him that compensation for other violations under other contracts would be withheld would have been comparable to, though not identical with, telling him that if he owed back taxes, or damages for a contract violation or a tort, the General Accounting Office would require that those amounts be deducted from his pay under the contract. We think the cited regula-

tion does not affect the Government's right to withhold.

The plaintiff is entitled to recover $60,859.92 for the Government's breach of contract. The United States is entitled to an offset of $19,908.58 against the plaintiff's recovery. Judgment will be entered for the plaintiff in the amount of $40,951.34.

It is so ordered.

JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.

LARAMORE, Judge, took no part in the consideration and decision of this case.