**BEACON CONSTRUCTION COMPANY OF MASSACHUSETTS**

**v.**

**The UNITED STATES.**

**No. 44–58.**

United States Court of Claims.

March 6, 1963.

Rehearing Denied May 10, 1963.

502

Robert J. Sherer, Boston, Mass., for plaintiff. Frederick W. Roche, Boston, Mass., was on the briefs.

Philip W. Lowry, Washington, D. C., with whom was Joseph D. Guilfoyle, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE, and DAVIS, Judges.

DAVIS, Judge.

This breach-of-contract case arises out of the plaintiff's agreement with the Public Housing Administration to construct, at Presque Isle, Maine, a defense housing project consisting of 275 dwelling and 7 laundry units. The Government required plaintiff to bear the expense of certain work which is said to be outside the contract obligations. We find that, for the most part, plaintiff is not entitled to recover.

■■■■ The first claim is for weatherstripping the windows of the project units. The contract provided for storm-windows (in addition to the regular windows) and plaintiff installed those. But plaintiff's officers did not read the contract as calling for weather-stripping on the normal windows which were to be protected by storm-windows, and no such weather-stripping was furnished. After completion of the project, the defendant insisted that stripping was part of the contract and should have been supplied; on plaintiff's refusal to do this work, the Government entered into a substitute contract with another contractor, expending $16,144.81 which was withheld from plaintiff. Relief was denied by the contracting officer and the head of the agen-cy, both of whom decided that the contract documents required that metal weatherstrips be furnished and installed on all regular windows. Since the dispute is a legal one, turning on the meaning and application of the contract terms, neither plaintiff nor this court is bound by the adverse administrative rulings within the Public Housing Administration. See 41 U.S.C. § 322; Allied Contractors, Inc. v. United States, 124 F.Supp. 366, 370, 129 Ct.Cl. 400, 407 (1954); Ready-Mix Concrete Co., Ltd. v. United States, 158 F.Supp. 571, 577, 141 Ct.Cl. 168, 176 (1958); Kayfield Construction Corp. v. United States, 278 F.2d 217, 218 (C.A. 2, 1960) (cf. Salem Products Corp. v. United States, 298 F.2d 808, 810 (C.A. 2, 1962)); Kenny Construction Co. v. District of Columbia, 105 U.S.App.D.C. 8, 262 F.2d 926, 928–929 (1959).

The specifications, which accompanied the invitation for bids and constituted a part of the contract, were prepared by a firm of Boston architects hired by Public Housing Administration. In pertinent part, they provided that:

> "*Weatherstrips for entrance doors* shall be brass, bronze, zinc or stainless steel strips not less than .017 inches thick, one or two member, manufacturer's standard type, *providing a weather tight seal on all 4 edges of doors and casement and double hung sash.* They shall adjust themselves to the swelling and shrinking of the *sash* and frames without impairing their efficiency or the easy operation of the *sash* and doors. * * * Weatherstrip shall be provided for all doors, opening out, in service building." (emphasis added)

(In the building industry, "sash" is a generic term for a window; "double hung sash" is the ordinary type of window which moves up and down). One of the drawings supplied with the invitation for bids contained the notation "metal weatherstrips—see specifications," and a large red arrow pointed from this note to a double-hung regular window; in addition, there was a notation "metal sill?

covering" (a part of the weather-stripping of a window), again with an arrow pointing to the design of a window.

Anyone reading these contract papers as carefully as a prospective builder could not help but notice that, with respect to the weather-stripping of windows, something was gravely askew. The written specification starts by referring only to strips for entrance doors, not windows—but then that very opening sentence ends by requiring a weather-tight seal "on all 4 edges of doors and casement and double hung sash [i. e., windows]." The next sentence, too, refers to an adjustment of the weatherstrips to windows, as well as to doors; and the drawings twice link the ordinary windows of the units to weather-stripping. We think it undeniable that there are surfacial inconsistencies, at the least, within the specification itself and between the specification and the drawing—part of the specification appearing to provide weather-stripping only for the entrance doors, while another part as well as the drawings seem to cover windows as well—which were and must have been obvious to plaintiff from the time it began to prepare its bid.

Plaintiff did not, however, consult the defendant's representatives in settling this problem, but decided for itself that weather-strips were required solely for the doors and not for windows. Presumably it reached this conclusion on the basis of (i) the wording of the first part of the first sentence of the specification dealing with weather-stripping, plus (ii) plaintiff's understanding that the trade practice was that, even in Maine, weather-stripping is not installed on a regular window which is to be protected by a storm sash (as were the windows in this project). Accordingly, plaintiff calculated its bid and ordered its windows on the assumption that there would be no weather-stripping. It still asserts that this is the correct interpretation of the contract, emphasizing that, despite continuous supervision and regular inspections, defendant's officials never mentioned the absence of strips on the windows until after completion of the project when tenants began to complain of the drafts.[1] The Government urges that the omission of a requirement for window-stripping at the beginning of the pertinent specification was wholly inadvertent,[2] and that the remainder of the specification together with the drawings demonstrates that windows were included.

[redacted] As a matter of pure contract-construction, there is something to be said for both sides to this dispute, but in

1. There is no claim, as there could not be under the contract, that the Government's acceptance of the project precluded it from recovering for deviations from the specifications. But the plaintiff does argue that the absence of weather stripping on the windows must have been apparent to defendant's inspectors, and yet they never referred to it during the course of construction; plaintiff infers that these men did not believe such stripping to be required. Defendant's response is that its representatives expected the strips to be installed at the very last stage of performance, just before (or even after) the painting of the exterior of the window frames and doors; the brief points out that weather-stripping of doors is usually done after the doors are installed and painted. Plaintiff replies that it is good construction practice to install weather-stripping on windows at the same time the windows are manufactured, before they are installed in the building—and that the Government's inspectors must have been aware of this practice.

2. The standard-form specifications supplied by P.H.A. to the architects who drew the specifications for the Presque Isle project provided for weather-strips for casement and double-hung widows, in addition to entrance doors. The architect testified at the trial that the omission of the reference to the windows was the result of inadvertence or a stenographic error, not a purposeful omission. On the other hand, a witness for plaintiff—formerly employed by P.H.A. but an employee of plaintiff at the time of trial—testified that it was P.H.A.'s intention to omit weather-stripping for windows and that the inadvertence was the failure to correct the rest of the specifications and the drawings to accord with that aim. It is unnecessary to resolve this conflict.

any event the important handicap is the express warning given to plaintiff, before it bid, that plain ambiguities of this type, in the specifications and drawings, were to be taken up with the Public Housing Administration. Article 2 of the contract (which was, of course, known to plaintiff before it made its bid) declared that "In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense." The invitation to bid stated that requests for interpretation of the specifications and drawings could be made in writing to the Public Housing Administration, and that every interpretation made to a bidder would be issued as an addendum to the specifications and become part of the contract. We do not reach or decide the question of whether the provisions of Article 2, quoted above, would have any effect on the contractor's rights if the ambiguity creating the issue of contract-interpretation first appeared, or the problem arose, after the contract was signed. In this case it is plain that, as we have found, the discrepancy was in actual fact, and in reason must have been, fully known to plaintiff before it computed its bid.[3] It had ample cause and opportunity to seek an interpretation from the Government before consummating the agreement, but it did not do so, electing to rest on its own private reading. A prime purpose of these contractual provisions relating to ambiguities and discrepancies is to enable potential contractors (as well as the Government) to clarify the contract's meaning before the die is cast. The bidder who is on notice of an in-

cipient problem, but neglects to solve it as he is directed to do by this form of contractual preventive-hygiene, cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter (e. g., Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947)). Even more, the bidder in such a case is under an affirmative obligation. He "should call attention to an obvious omission in a specification, and make certain that the omission was deliberate, if he intends to take advantage of it." Ring Construction Corp. v. United States, 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958). See also, to the same effect, Jefferson Constr. Co. v. United States, Ct.Cl. No. 137-58, decided Oct. 5, 1960, slip op. 14-16. If the bidder fails to resort to the remedy proffered by the Government, a patent and glaring discrepancy (like that which existed here) should be taken against him in interpreting the contract. We do not mean to rule that, under such contract provisions, the contractor must at his peril remove any possible ambiguity prior to bidding[4]; what we do hold is that, when he is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government's representatives if he intends to bridge the crevasse in his own favor. Having failed to take that route, plaintiff is now barred from recovering on this demand.

The second claim relates to some roof panel and girder work which plaintiff deems a compensable change under the contract. After completion of the project, the Public Housing Administration told plaintiff that, among other things, it had failed to comply with the

3. The testimony of plaintiff's president makes it clear that he noticed the ambiguity at once. Moreover, in the administrative proceedings before the Public Housing Administration, plaintiff supplied an affidavit of an estimator for Gregg & Son, Inc. (a subcontractor of Bush Prefabricated Structures, Inc., which made the window units for plaintiff) which showed that plaintiff's window subcontractors were aware, as early as

March 1952, of the ambiguity and sought to settle it by speaking to the architects who had drafted the specifications for P.H.A. Plaintiff's contract with the Government was made on April 9, 1952.

4. Or that these contract provisions apply where a possible ambiguity is readily resolved by a reading of the contract as a whole.

contract requirements because the roof rafters in many of the bedrooms had separated from the supporting girders. Specific directions were given for remedying the defect. One of the items was an additional roof tie which defendant agreed was an extra; to cover this addition, defendant issued in April 1953 a change order No. 44 for $1,487.75, which the contractor promptly accepted. Reserving its right to claim compensation for all of this roof panel and girder work, plaintiff performed the job and then sought, under the "changes" provisions of the contract, a further payment of $4,999.09 (covering $1,487.75 for change order No. 44 plus $3,511.34 for the other work). In April 1954, the Acting Director of the New York Field Office of the Public Housing Administration, as successor contracting officer to the Boston Field Office, denied the claim for the additional $3,511.34 and rescinded change order No. 44. In February 1956, the Director of the New York Field Office reaffirmed this decision. Plaintiff appealed from neither determination.

The Trial Commissioner has found, and we agree, that these administrative findings cannot be disregarded as failing to meet the standards of the Wunderlich Act, 41 U.S.C. §§ 321–322. Although the contract required three 12d nails at many crucial points, plaintiff used only two, thus significantly reducing the tendency of the rafters and the girders to hold together. Plaintiff's excuse was that use of three nails was not feasible at all the designated points, but the administrators properly found that plaintiff failed to drive three nails at the many spots where it was quite possible to do so. Moreover, plaintiff's failure to appeal the contracting officer's factual decision to the head of the agency precludes it from maintaining the claim in court. United States v. Joseph A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946). It is said that the letters from the New York Field Office were not entitled to be treated as appealable decisions of the contracting officer under the Disputes article because the contractor was not officially told that the New York Office had become the successor contracting office and, also, because the letters did not inform plaintiff in terms that they were official decisions determining the dispute. These objections are without substance; the record shows that plaintiff knew full well the status of the New York Office after the Boston Office closed, and plaintiff could not have read the New York letters without realizing that they were formal determinations of the controversy.

■ From this conclusion that plaintiff cannot recover on its second claim we except the $1,487.75 granted it by change order No. 44 (in April 1953) by the Boston Field Office. This was a final action by the contracting officer, not subject to rescission after the work was done in reliance on the Government's promise to pay for it. In accordance with the "changes" provisions, the contract was modified to increase plaintiff's compensation.[5] The New York Field Office had no authority, in April 1954, unilaterally to rescind this change order and contract modification. Plaintiff was not bound by the unauthorized rescission and was not required to appeal to the agency head in order to preserve its right to the $1,487.75 upon which agreement had already been reached.

Plaintiff can recover only the $1,487.75 to which it is entitled under change order No. 44. It cannot recover on any of the other aspects of the claims, and as to them the petition will be dismissed.

5. On this record and under the practice and conditions of this contract, we find that this change was sufficiently approved within the requirement of the Changes article that contract increases of more than $500 shall not be ordered unless approved in writing by the head of the department or his duly authorized representative.