**STEIN BROS. MFG. CO.**

v.

**The UNITED STATES.**

No. 389–59.

United States Court of Claims.
July 12, 1963.
Rehearing Denied Oct. 11, 1963.

---

Alfred M. Osgood, Washington, D. C., for plaintiff. John P. Lipscomb, Washington, D. C., of counsel.

Philip W. Lowry, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

PER CURIAM.

This contract case was referred to trial commissioner C. Murray Bernhardt, pursuant to Rule 45(a), for findings of fact and a recommendation for a conclusion of law. The commissioner has filed his report containing an opinion, proposed findings of fact, and a recommended conclusion of law. He would hold that the plaintiff is entitled to recover, with recovery to be determined under Rule 38 (c). The plaintiff accepts the commissioner's opinion and proposed legal conclusion, and offers only minor objection to certain of the findings. The defendant excepts to the commissioner's opinion, his recommended conclusion of law, and many of the proposed findings. Briefs have been filed and there has been oral argument.

The court agrees with the opinion, findings, and recommended conclusion of the trial commissioner and adopts them (with minor modifications in the findings), together with this opinion, as the basis for its judgment in this case. Since the case was tried and the commissioner's

report filed before the grant of certiorari and the ruling in United States v. Carlo Bianchi and Company, Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652, decided June 3, 1963, the commissioner's opinion does not take account of that recent decision. It is appropriate therefore to explain why, after Bianchi, we adopt the commissioner's opinion and findings even though they refer to and rest upon significant evidence which was not before the Armed Services Board of Contract Appeals but was first introduced at the trial in this court.[1]

█ The ultimate issue in the case, relating to the meaning of the contract specifications, is one of law not of fact (see, *e. g.*, W. H. Edwards Engineering Corp. v. United States, Ct.Cl., No. 218–59, decided April 5, 1963; Guyler v. United States, Ct.Cl., 314 F.2d 506, decided March 6, 1963); that being so, it may very well be that this court is not precluded by the Bianchi decision or the Wunderlich Act (41 U.S.C. §§ 321–322) from considering any evidence bearing on that legal issue, no matter what the Board of Contract Appeals determined or what was in the record before it. But we need not face that issue in the present case since there is another ground on which we can properly consider the new evidence without in any way flouting the Supreme Court's ruling. That ground is the failure of the defendant to object to the admission or consideration of the new evidence at the trial in this court. Contrary to its action in the Bianchi case (373 U.S. 717, 83 S.Ct. 1415), the Government did not here oppose or object to such evidence becoming a full part of the

case, at any time until after the oral argument before this court. There was no hint of an objection at the trial; in fact, the Government introduced a quantity of new evidence to bolster the record before the Board. No objection to new evidence was stated in the briefs. Nor was one made at the argument. However, shortly thereafter the Government informed us that it did object. In these circumstances, we consider that no objection was timely made and that any exception available to the Government was voluntarily foregone and relinquished— unless the requirement stated in the Bianchi decision is a jurisdictional one which cannot be waived while the case is pending in this court.

█ We do not regard the Bianchi requirement as jurisdictional in that sense. The Wunderlich Act, itself, is not phrased in jurisdictional terms, and its legislative history does not suggest that Congress considered its provision for limited review so compelling that the Government could not waive it, wholly or partially.[2] In Bianchi, the Supreme Court took pains to point out twice that the Government had affirmatively objected to the admission or consideration of new evidence in that case. There is nothing in the opinion to suggest that these objections were unnecessary or that the Court's holding is a jurisdictional one. The opinions in the earlier cases in which the Supreme Court upheld finality clauses in Government contracts were likewise free from any suggestion that such clauses deprived this court of power; those decisions applied rules of contract law, not of judicial jurisdiction.[3] That the

1. The significant new evidence is reflected in findings 21 and 22. It shows that the defendant's representatives recognized, in the midst of the controversy with plaintiff, that the specification in question was neither clear nor unambiguous, but in fact was erroneously worded (from the viewpoint of the Government).

At the request of the court, the parties have filed supplementary memoranda on the effect of Bianchi on the present case.

2. There is, of course, nothing to prevent the Government from omitting a finality

clause from all or any one of its contracts.

3. See United States v. Wunderlich, 342 U. S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951); United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256 (1950); United States v. Joseph A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946); United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944); United States v. Callahan Walker Construction Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49 (1942); Merrill-Ruckgaber

problem is evidential or procedural, not jurisdictional, is also indicated by the two cases cited by the Supreme Court in Bianchi as showing that a court of original jurisdiction can perform the function of reviewing an administrative decision on the record made before the agency— Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524 (1930), and National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). The opinion in the former characterizes as "a question of practice" the issue of whether *de novo* evidence should be introduced in the course of judicial review (see 280 U.S. at 442, 50 S.Ct. 220); the opinion in the latter calls this issue "a procedural point" (319 U.S. at 227, 63 S.Ct. 997). In both cases the Government had made timely objection against admission of new evidence (see D.C., 29 F.2d 750, 757; 319 U.S. at 227, 63 S.Ct. 997); in deciding that *de novo* evidence should not be considered by the reviewing court, the Supreme Court was thus passing upon a point which had been duly raised during the proceedings in the reviewing court.

On principle, there is no more reason to consider the limitations of the Wunderlich Act to be non-waivable than in the case of other rules of procedure, practice, evidence—or even rules of substantive law—which are normally inapplicable if not properly invoked by the party benefitting from them. The important defense of failure to exhaust an administrative remedy, for example, must be raised if reliance is to be placed on it. There are many similar rules in this and other courts.[4] The rule precluding *de novo* evidence under the Wunderlich Act seems to us to stand on the same footing. It is not of such importance or character

that it must be held to limit the court's basic power as a court. The statute of limitations is not analogous. For this court the bar of limitations is jurisdictional because Congress has thus limited its consent to sue the United States (Soriano v. United States, 352 U.S. 270, 273–274, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957)). But the Wunderlich Act is not a condition imposed upon suit against the sovereign; it is legislation governing suits by as well as against the United States and therefore more akin to a nonjurisdictional rule of procedural or substantive law which can usually be adduced or abandoned as the litigant sees fit.

■■ There is one further problem in the general area of the Bianchi case. Having found that defendant breached the contract by refusing additional compensation for misinterpreting the original specifications and then changing them, we are returning the case to the trial commissioner under our Rule 38(c) for the determination of the amount of recovery. This is the appropriate procedure, instead of suspending to allow plaintiff to return to prove his case for compensation and damages before the contracting officer and/or the Board of Contract Appeals. Regardless of whether this case be viewed as arising under the Changes article of the contract or purely as an action for breach of contract outside the Changes article, trial before our commissioner is now the proper method of determining the amount of recovery. Since neither the contracting officer nor the Board of Contract Appeals reached the issue of compensation or recovery, a remand under Rule 38(c) does not contravene the requirement of the Wunderlich Act or the holding in Bianchi that departmental findings must be re-

Co. v. United States, 241 U.S. 387, 393, 36 S.Ct. 662, 60 L.Ed. 1058 (1916); Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342 (1913); Ripley v. United States, 223 U.S. 695, 32 S.Ct. 352, 56 L.Ed. 614 (1912); United States v. Gleason, 175 U.S. 588, 602, 20 S.Ct. 228, 44 L.Ed. 284 (1900); Sweeney v. United States, 109 U.S. 618, 3 S.Ct. 344, 27 L. Ed. 1053 (1883); Kihlberg v. United

States, 97 U.S. 398, 24 L.Ed. 1106 (1878).

4. Rule 15(b) of our Rules requires a party affirmatively to set forth "accord and satisfaction, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense."

viewed on the basis of the record before the agency. There were no departmental findings on the amount of compensation or recovery; very little testimony was taken on that issue before the Board and it was agreed that if the contractor prevailed on its appeal to the Board the matter of compensation would be remanded to the contracting officer for further development. To return the case at its present stage to the Army for a hearing and findings on that subject would only add to the delay which the Supreme Court sought to diminish through its ruling— without countervailing advantages. Unlike the Courts of Appeals when reviewing administrative decisions, this court and the district courts are well equipped to take and consider evidence on damage questions not decided by the administrative agencies because they ruled against the contractor on the merits of his claim. In addition, the Wunderlich Act— unlike the normal statute vesting power in an administrative agency—does not grant the administrative bodies exclusive jurisdiction over the entire subject of the contract; the Act merely makes the administrative findings conclusive (in the absence of arbitrary action, etc.) on those particular matters of fact dealt with by the administrators, without depriving this court of its general jurisdiction over the contract under the Tucker Act. Accordingly, it will not trench upon the terms or policy of the Wunderlich Act, but will save the time and convenience of all parties, to try damage issues in this court where, as here, the agency has not reached or passed upon that phase.[5]

The plaintiff is entitled to recover and judgment will be entered to that effect.

The amount of recovery will be determined pursuant to Rule 38(c).

## OPINION OF COMMISSIONER

The plaintiff sues for breach of two contracts with the Army let in June 1955 through the Philadelphia Quartermaster Depot for the production of pneumatic mattresses. The breach alleged consists of the issuance of post-award change orders which are accused of altering certain test requirements incorporated by reference into the contract specifications so as to impose upon the plaintiff a greater requirement for the adhesive strength of $\frac{1}{4}''$ molded seams than the plaintiff thought the specifications initially demanded, thus resulting in losses due to delays and extra material costs denied to the plaintiff in its appeal under the Disputes clause to the Armed Services Board of Contract Appeals. The defendant not only relies on the finality of the ASBCA decision under the Disputes clause of the contracts, but also says that the change orders did not change but merely clarified certain aspects of test methods which were not applicable to the contracts in the first place, and that, furthermore, the plaintiff's action in stopping production voluntarily without just cause is an intervening cause which precludes it from recovery of damages due to delay of its own making. The issue of damages has been severed for future attention depending on the decision as to liability to which this opinion and report are confined.

The mattresses were made of rubber-covered nylon fabric fashioned into a shape suitable for inflation according to military specifications incorporated into

5. In cases in which the administrative authorities have failed or refused to determine a dispute which should have been decided under the Disputes article of the contract, the courts have customarily made that determination for themselves. See Brister & Koester Lumber Corp. v. United States, 88 U.S.App.D.C. 197, 188 F.2d 986 (1951); Maxan Dress Corp. v. United States, 115 F.Supp. 439, 443, 126 Ct.Cl. 434, 442 (1953); United States Casualty Co. v. United States, 67 F.Supp. 950, 954, 107 Ct.Cl. 46, 68 (1946); Manu-facturers' Casualty Ins. Co. v. United States, 63 F.Supp. 759, 760, 105 Ct.Cl. 342, 351 (1946); Cape Ann Granite Co., Inc. v. United States, 100 Ct.Cl. 53, 71 (1943), cert. denied, 321 U.S. 790, 64 S. Ct. 785, 88 L.Ed. 1080 (1944); Thomas Earle & Sons, Inc. v. United States, 100 Ct.Cl. 494, 504–505 (1944); James Mc-Hugh Sons, Inc. v. United States, 99 Ct. Cl. 414, 431 (1943); Karno-Smith Co. v. United States, 84 Ct.Cl. 110, 124 (1936); Heid Brothers, Inc. v. United States, 69 Ct.Cl. 704, 712 (1930).

the contracts. The minimum adhesive strength of its various seams were set forth in Table I of the specifications which read pertinently as follows:

TABLE I.—*Requirements for coated fabrics*

| | Number of determinations to be tested per sample unit | Requirements for average of determinations on sample units | Lot average requirements | |
|---|---|---|---|---|
| | | Min. | Min. | Max. |
| 1. Overall weight, ounces per square yard ...... | 3 | .......... | 8.0 | [1] 10.0 |
| * * * * * * * * | | * * | | |
| 16. Adhesion, coating to fabric, pounds .......... | 3 | 6 | 8 | ....... |
| 17. Adhesion seams 1½ inches, pounds .......... | 3 | 3 | 4 | ....... |
| 18. Adhesion, seams 1½ inches, after immersion, pounds ..................................... | 3 | 3 | 4 | ....... |
| 19. Adhesion, seams ½ inch, pounds .............. | 3 | 1.5 | 2 | ....... |
| 20. Adhesion, seams ½ inch, after immersion, pounds ..................................... | 3 | 1.5 | 2 | ....... |
| 21. Adhesion, seams ⅜ inch, molded, pounds ...... | 3 | 2.5 | 3 | ....... |
| 22. Adhesion, seams ⅜ inch, molded, after immersion, pounds ............................. | 3 | 2.5 | 3 | ....... |
| 23. Adhesion, seams ¼ inch, molded, pounds ...... | 3 | 2.5 | 3 | ....... |
| 24. Adhesion, seams ¼ inch, molded, after immersion, pounds ............................. | 3 | 2.5 | 3 | ....... |
| * * * * * * * * | | * * | | |

[1] This value was changed to 11.5 ounces by Amendment No. 2 prior to award of the contracts in suit.

NOTE: If an individual test result appears markedly different from the other specimens due to faulty operation, in conductance of the test, it shall be discarded and a new test made to replace the discarded value.

The ¼″ molded seams referred to in items 23 and 24 of the above table form C-beams which serve to hold the mattress in shape, and the ⅜″ molded seams referred to in items 21 and 22 run along the edges of the mattress and retain air when the mattress is inflated.

Federal Specification CCC–T–191 entitled "Textile Test Methods" was incorporated by reference into the basic specifications governing the contracts in suit, and paragraph 4.3 of the basic specifications entitled "Tests" provided that the methods of testing in Federal Specification CCC–T–191, "wherever aplicable, shall be followed". Paragraph 4.3.3.2.2 of the basic specifications further provided that the adhesive strength of the ¼″ molded seams "shall be tested as specified in Method 5962 of Specification CCC–T–191." Test Method 5962, entitled "Adhesion of Strapped Seams", which is contained in Specification CCC–T–191, provides that the testing procedure and reporting thereof "shall be that described in method 5960", which is also contained in Specification CCC–T–191. In turn, Method 5960, after describing the selection of the test specimen, testing apparatus, and the testing procedure, provides under paragraph 5 entitled "Report" a subparagraph 5.1 entitled "Adhesion of Specimen", reading as follows:

"The adhesion of the specimen shall be the average of the five highest peak loads of resistance registered for 3 inches of separation of the seam *divided by the width of the seam in inches*. If the number of peak loads is less than five, the average of the loads for the lesser number of peaks *divided by the width of the seam in inches* shall be the adhesion of the specimen." [Emphasis supplied.]

The plaintiff concluded that the foregoing provisions of the basic specifications and referenced documents collec-

tively required a ¼″ molded seam testing at ¾ pound, or at the rate of 3 pounds per inch, while the defendant maintains they require 3 pounds for the ¼″ seam because the words "divided by the width of the seam in inches", quoted from Method 5960 in the preceding paragraph, are not applicable. This 400 percent difference between the respective interpretations is the root of the dispute.

The parties first became aware of their disagreement during the preproduction phases of the contract. The plaintiff tested out its first experimental ¼″ seams at 1½ pounds, or at the rate of 6 pounds per inch, which it considered to be twice its concept of the specification requirement of 3 pounds. On August 3, 1955, the contracting officer approved the seam as conforming to specifications on the basis of a courtesy test made by the Philadelphia Quartermaster Depot which showed that the ¼″ seams had satisfactorily tested out at 3 pounds,[6] which was stated to be the specification requirement. The plaintiff was puzzled and dissatisfied with this report of marginal compliance, since it varied radically from its own test results, so ran further seam adhesion tests, as did its material supplier, Haartz-Mason. These resulted in the same showing as before. In the meantime, the contracting officer had received a complete preproduction mattress from plaintiff and reported on August 15 that it passed visual examination.

By mid-August plaintiff was fully prepared for production but, because of the disturbing results reported by the defendant on the seam adhesion tests, it suspended operations, including the rubber coating of base fabric by its supplier. Under the circumstances this suspension was justified and prudent, for to have proceeded into production when the seams were reported by the Government to only barely meet adhesion requirements, while they were substantially less than the Government's version of those requirements in testing by plaintiff, would have invited a risk of substantial production rejec-

tions. A distinct correlation existed between the thickness of the rubber coating on the fabric and the strength of the molded seam, so if the plaintiff were going to have to produce molded seams complying with the Government's interpretation of the adhesion requirements, it would have to order more costly material with a heavier rubber coating in order to have a reasonable margin of safety.

On August 17, 1955, the plaintiff wrote to the contracting officer explaining its interpretation of the specifications governing the ¼″ seam adhesion requirement and advising that production had been suspended pending confirmation of its views. The following day the plaintiff sent to the contracting officer another preproduction sample mattress with a request that it be fully tested, including destructive tests, for the fact that the mattress it had sent earlier had passed the defendant's visual examination was not sufficient assurance for the plaintiff to undertake full scale production. On September 2, 1955, the contracting officer informed plaintiff that the latter's interpretation of the adhesion requirement for the ¼″ seam was wrong, that in effect the parts of Test Method 5962 upon which plaintiff relied did not apply, and that the requirement for the ¼″ seam was 3 pounds per ¼″.

At a conference on September 15, 1955, attended by representatives of all parties affected, including plaintiff's supplier, the dispute was discussed at length and the contracting officer adhered to his previously announced position. Accordingly, the plaintiff then instructed Haartz-Mason to furnish a material with a heavier rubber coating so as to meet the defendant's requirement for the ¼″ seam. Actually, Haartz-Mason had been experimenting since mid-August with such a material.

In the meantime, and unknown to plaintiff until discovered just prior to the trial in this court, the contracting officer's legal and technical advisers dis-

---

6. The record does not satisfactorily explain how the direct machine readings for the ¼″ seams by the Government and the plaintiff could have been at such variance.

cussed among themselves the problem and its correction. The Government consultant who had written the specifications acknowledged to his superiors that there were errors and conflicts in the specifications, and he was not aware until that time that the language of Test Method 5962 contained the key words "divided by the width of the seam in inches", which lent some credence to the plaintiff's view that the adhesion requirements of the specifications were impliedly couched in terms of pounds per inch. The two memoranda of September 16, 1955, which reflect these discussions among the contracting officer's personnel, are in evidence here but were not in the record before the ASBCA. They are in stark conflict with the official position taken by the contracting officer and by his principal assistant before the ASBCA that the specifications were clear and unambiguous. They conclude with this statement:

"It was agreed there is no clear explanation that could be given the contractor concerning this lack of clarification and Mr. Moldawer [an Army attorney] stated that it now appeared to be a legal problem insofar as determining what action to take in this matter."

The contracting officer's solution was to issue change orders on September 23, 1955, which deleted from Test Method 5962 the offending and confusing language "divided by the width of the seam in inches," for the announced purpose "to alleviate any areas of conflict caused by any misunderstanding of the specifications." Plaintiff was notified on September 21 that its delay in starting production would not be considered excusable because the contracting officer had advised plaintiff on August 15 that its preproduction sample mattress had been approved. Plaintiff promptly instructed its supplier Haartz-Mason on September 22 to resume coating of the material, using a heavier rubber coating for reasons which have been explained.

Both contracts were fully performed by May 4, 1956. The change orders had provided for no increase in compensation nor for time extensions, so in October 1955 the plaintiff had requested both. The time extensions were granted and on July 14, 1956, the plaintiff filed its formal claim for increased costs in a reduced amount. This was denied by the contracting officer in his findings of fact and decision of August 27, 1956, on the grounds that the adhesion requirements of the specifications were clear and unambiguous, that the language stricken from Test Method 5962 by the change orders was not applicable to the determination of adhesion requirements, and that its deletion was for purposes of clarification rather than elimination of an ambiguity.

This adverse decision was duly appealed, and on February 20, 1958, the ASBCA denied the appeal on the grounds that the adhesion requirement of 3 pounds for the 1/4" seam, as provided in Table I of the specifications, was clear and unambiguous, and that the method of computing adhesion prescribed in Test Method 5962 was not applicable to the contract.

Clearly the plaintiff entered into the contract on the assumption that it required only one-fourth of the adhesive strength for the 1/4" seams actually intended by the Government, and this, in turn, resulted in extra costs due to delays and a more expensive material using a heavier rubber coating. It must be determined whether it was misled into this error by ambiguity of the specifications which were prepared by the defendant. As a prefatory matter, it should be stated that the general practice in both industry and Government was to express adhesion weights of molded seams in pounds, which has an accepted meaning of pounds per inch of seam width unless it is otherwise expressly stated. This fact was advanced by plaintiff' and was not challenged during the administrative hearing,[7] but it was not referred to in the

7. It was unconvincingly refuted at the trial in this court.

ASBCA decision so apparently was given no weight. Without this understanding and without the key words in Test Method 5962, which were excised by the change orders, unquestionably the literal wording of Table I in the specifications would convey the requirement that ¼″ molded seams must withstand a pull of at least 3 pounds, as the Government contends. But to a manufacturer familiar with the industrial practice of expressing adhesion values on a common basis of pounds per inch for purposes of convenient comparison, the data in Table I takes on a different light, particularly where he is directed in the incorporated Test Method 5962 to report adhesion weights in terms of pounds per inch. The presence in Test Method 5962 of the key words "divided by the width of the seam in inches" would logically confirm in the plaintiff's mind the defendant's awareness of and intention to follow the prevailing practice.

Moreover, the plaintiff believed that the adhesive strengths of the seams of various widths and of the rubber coating to the nylon fabric as they were prescribed in Table I of the specifications were intended to preserve an approximately standard relationship to each other throughout the mattress, for the internal air pressure of the mattress when inflated and in use should be exerted equally in all directions against the containing fabric and its seams. Without going into all of the detailed mathematics of the problem it would appear that plaintiff was correct in believing that its interpretation of the adhesion requirements expressed in Table I for the various parts of the mattress would provide a more standard relationship than if, as the defendant contends, the Table I requirement for ¼″ molded seams were to be read directly as 3 pounds per ¼″ instead of 3 pounds per inch. Further comparison of the adhesion requirements in Table I gives additional validity to the plaintiff's view that its interpretation would result in a more consistent relationship of strengths throughout the mattress. For example, Table I coupled with a referenced test method provides in substance that the adhesion of the rubber coating to the fabric must be at least 4 pounds per inch, whereas defendant's interpretation of the Table I requirement for the ¼″ and ⅜″ molded seams would be *at the rate* of 12 and 8 pounds per inch, respectively. Since two pieces of rubber-coated fabric are pressed together on a die under heat to mold a seam, it would be theoretically inconsistent to require that the adhesive strength of the ¼″ and ⅜″ seams be three and two times, respectively, greater than the bond between the rubber coating and its host fabric, even though the molding of the seams by heat and pressure serves to strengthen slightly the bond between the rubber coating and the fabric in those areas.

If we add to the foregoing reasoning the uncertainty which the author of the specifications himself expressed as to their lack of clarity, we are brought to the rule expressed in the case of Peter Kiewit & Sons' Company, et al., v. United States, 109 Ct.Cl. 390 (1947), at page 418:

"* * * Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted. Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it. This rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions."

This principle was cited with approval more recently in Western Contracting Corporation v. United States, 144 Ct.Cl. 318, 326, and in Anderson Construction Co. v. United States, 289 F.2d 809 (Ct.

Cl.1961). All of the elements requisite for application of the rule in Kiewit are present in the instant case.

That the ASBCA erred in its decision is clear from what has been said above. Whether it was sufficiently in error to warrant reversal may depend on the standards imposed by the Wunderlich Act (41 U.S.C. §§ 321, 322), which immunizes from judicial correction administrative decisions on questions of fact unless they are "fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or [are] not supported by substantial evidence." But the Act also precludes finality to any administrative decision on matters of law. The distinction between law and fact, a vestigial transplant from the jury system where the law is the domain of the judge and the facts of the jury, has been a frequent battleground for courts [8] and commentators.[9] In truth it is a brave but habitually futile exercise to establish wash proof guidelines for these fraternal twins in whom there is a liberal admixture of genes. If it can be generalized this court customarily has found interpretation of contract provisions to be a question of law. See cases cited in Wunderlich, et al., v. United States, 117 Ct.Cl. 92, 212–214; Cramp Shipbuilding Co. v. United States, 122 Ct.Cl. 72, 97; Ready-Mix Concrete Co., Ltd., v. United States, 158 F.Supp. 571, 141 Ct. Cl. 168, 176; Associated Traders, Inc., v. United States, 169 F.Supp. 502, 144 Ct. Cl. 744, 750–751. In John Kelley Co. v. Comm'r., 326 U.S. 521, at page 527, 66 S.Ct. 299, at page 302, 90 L.Ed. 278, the Supreme Court footnoted a pithy comment, from Dickinson, Administrative Justice, c. III, p. 55:

"  *  *  *  Matters of law grow downward into roots of fact, and matters of fact reach upward, without a break, into matters of law. The knife of policy alone effects an artificial cleavage at the point where the court chooses to draw the line between public interest and private right."

Demarcation is sometimes simplified in a case, such as here, where interpretation of a contract specification is in issue. If the query is as to whether a given product complies with specifications, then in all likelihood conflicting facts must be entertained and resolved. If it is as to whether specifications require a product to be made in a certain manner, then the solution just as probably lies within the four corners of the instrument and will yield to the logic of language analysis, a lawyer's job. These distinctions are illustrated in Crystal Soap & Chemical Co., Inc., v. United States, 103 Ct.Cl. 166 (1945), and in Wagner Whirler and Derrick Corp. v. United States, 121 F.Supp. 664, 128 Ct.Cl. 382, 393–394 (1954). In the present case the plaintiff is insisting on one interpretation of the specifications for seam adhesion and defendant is insisting on another interpretation which would make the seams four times as strong. The question is which interpretation is correct, and there is no question or argument as to the product which would result from either interpretation. With but one exception the problem can be solved on the basis of undisputed facts. The sole exception is the fact that the general practice in both industry and Government was to express adhesion weights of molded seams in terms of pounds per inch. This fact is not determinative of the issue unaided, but merely influences a determination which is persuasive for other reasons. Moreover, it was not mentioned by either the contracting officer or the ASBCA in their respective adjudications, and so presents no

---

8. This question has been intelligently explored in River Construction Corp. v. United States, Ct.Cl. No. 13–56, now awaiting argument before the court on Commissioner Bennett's opinion, findings of fact, and recommendation for conclusion of law. [See River Construction Corp. v. United States, Ct.Cl. No. 13–56, decided *per curiam*, Nov. 7, 1962].

9. Birnbaum, Questions of Law and Fact and the Jurisdiction of the Armed Services Board of Contract Appeals, Fed. B.J. 19:2—Apr. '59.

barrier of finality to overcome. Accordingly, the controversy is one sounding in law and is thus outside the scope of the Disputes article in the contracts. As stated in Navy Contract Law, 2d Ed., § 9.30, at page 553:

"* * * the Board may in its discretion pass upon all questions of law necessary for a complete adjudication of the issues of fact presented,[10] 'Finality', however, will attach only to the Board's decision on questions of fact, not to its ruling on any question of law." [11]

The plaintiff is entitled to recover its damages flowing proximately from the breach of contract by the defendant, the amount of damages to be determined in accordance with Rule 38(c).

---

10. Par. 4 of the Charter of the ASBCA, ASPR, App. A, Part 1 (Jan. 3, 1955).

11. Par. (b) of the standard "Disputes" clause. ASPR 7–103.12 (Sept. 5, 1958).